L. L. DUXBURY, JR., AND OTHERS v.
JOSEPH L. DONOVAN AND ANOTHER.

138 N. W. (2d) 692.

November 26, 1965—No. 40,051.

*Robert W. Mattson,* Attorney General, and *John F. Casey, Jr.,* Deputy Attorney General, for appellants.

*Frank Hammond, Richard H. Kyle, Jonathan H. Morgan,* and *Briggs & Morgan,* for respondents.

*John J. Cound* and *David L. Graven,* amici curiae.

SHERAN, JUSTICE.

Appeal from a judgment of the district court.

At the 1965 session of the Legislature of the State of Minnesota an act labeled Senate File 102, which prescribes the boundaries of senatorial and representative districts and apportions anew senators and representatives among the several districts, was introduced and passed by a majority vote of the Senate and of the House of Representatives. The bill, enrolled and signed by the presiding officer of each house of the legislature, was presented to the governor of this state. On May 24, 1965, he returned it to the Senate not approved and with stated objections. S. F. 102 is now in the possession of defendant H. Y. Torrey as secretary of the senate. Both houses of the legislature adjourned sine die on May 24, 1965.

Action was instituted by plaintiffs as residents and qualified voters of

the State of Minnesota and duly elected members of its House of Representatives seeking a judicial determination that under our constitution and laws S. F. 102 became complete and effective upon final passage of it by the Senate and House of Representatives and that the governor was without power to veto it.

The district court determined upon stipulated facts and in response to reciprocal motions for summary judgment that the relief requested by plaintiffs should be granted. Judgment has been entered accordingly. By its terms defendant Torrey, as secretary of the senate, is commanded to turn said S. F. 102 over to defendant Joseph L. Donovan, secretary of state for the State of Minnesota, who is commanded to receive and file said S. F. 102 as being complete and effective. By stipulation, confirmed by an order of the district court, the operation and enforcement of the judgment has been stayed pending determination of this appeal.

The principal issue for decision is whether the Minnesota Legislature, consisting of the Senate and the House of Representatives, has sole and exclusive power under the Minnesota Constitution to redistrict and reapportion.

■ The issue we are called upon to decide has significance which goes beyond the question of whether this particular veto to this particular enactment of the state legislature was warranted. In a state where the population is both growing and mobile we know that the problem of legislative apportionment will be a recurring one. Our decision here will remain a binding interpretation of fundamental law unless changed or modified by the difficult process of constitutional amendment.

The concepts with which we are concerned involve such basic considerations as (a) the division of authority between the executive, legislative, and judicial branches of our government; (b) the nature of the veto power invested by the constitution in the chief executive; (c) the significance of legislative apportionment as an exercise of governmental power and the effect which the fixing of boundaries of legislative districts may have on the citizen's right to be represented; (d) the measure in which the words used by those who formulated our constitution over a century ago can be said to convey a clear, unequivocal, and binding directive in this current situation.

■ Except in so far as a delegation of authority to the Federal government is to be found in the Federal Constitution, governmental authority remains in the states.[1] The governmental powers of the State of Minnesota are, by the terms of Minn. Const. art. 3, § 1, "divided into three distinct departments—legislative, executive, and judicial; and no person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others, except in the instances expressly provided in this constitution." Minn. Const. art. 4, § 1, states: "The legislature shall consist of the Senate and House of Representatives." The word "legislature," as used in the Minnesota Constitution, can admit of only one meaning—that branch of government consisting of the Senate and the House of Representatives.[2] By Minn. Const. art. 4, § 13, it is provided: "No law shall be passed unless voted for by a majority of all the members elected to each branch of the legislature, and the vote entered upon the journal of each house."

■ Our constitution gives to the governor the power to affect legislation by a qualified veto. Minn. Const. art. 4, § 11, provides:

"Every bill which shall have passed the Senate and House of Representatives, * * * shall, before it becomes a law, be presented to the governor of the State. If he approves, he shall sign and deposit it in the office of secretary of state for preservation, and notify the house where it originated of the fact. But if not, he shall return it, with his objections, to the house in which it shall have originated; when such objections shall be entered at large on the journal of the same, and the house shall proceed to reconsider the bill. If, after such reconsideration, two-thirds of that house shall agree to pass the bill, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered; and if it be approved by two-thirds of that house it shall become a law. * * *"

And Minn. Const. art. 4, § 12, provides:

---

[1] See, 81 C. J. S., States, § 7; 17 Dunnell, Dig. (3 ed.) § 8823.

[2] State ex rel. Smiley v. Holm, 184 Minn. 228, 238 N. W. 494, reversed on other grounds, 285 U. S. 355, 52 S. Ct. 397, 76 L. ed. 795; State ex rel. Gardner v. Holm, 241 Minn. 125, 62 N. W. (2d) 52.

"No money shall be appropriated except by bill. Every order, resolution or vote requiring the concurrence of the two houses (except such as relate to the business or adjournment of the same) shall be presented to the governor for his signature, and, before the same shall take effect, shall be approved by him, or, being returned by him with his objections, shall be repassed by two-thirds of the members of the two houses, according to the rules and limitations prescribed in case of a bill."

The power of the chief executive with respect to appropriations was broadened by the amendment adopted November 7, 1876, so that now, instead of being required to accept or reject appropriation bills in their entirety, the governor can veto one or more items of appropriations of money appearing in a bill while approving the balance.

These provisions limiting the legislative power mesh with the provisions of Minn. Const. art. 5, § 4, defining the powers and duties of the governor as including "a negative upon all laws passed by the legislature, under such rules and limitations as are in this Constitution prescribed."

The veto, with historical roots extending at least to the Roman Era,[3] was used in this country from colonial times.[4] Among the Thirteen Original Colonies, inclusion of the veto power was the exception.[5] However, the framers of the Constitution, meeting in Philadelphia in 1787, recognized the need of some form of veto power in the executive.[6] The new states as they entered the Union were more favorable in their attitude

---

[3] See, Hunter, Roman Law (3 ed.) (1897) p. 14.

[4] In the latter part of the 18th century in England the veto power of the Crown was seldom used with respect to domestic legislation. In contrast, the abuse of the veto power by the king and by the governors of the royal colonies who had also been vested with it was a major cause of disaffection. And the Declaration of Independence specifies as its first two grievances against the Crown the following:

"He has refused his Assent to Laws, the most wholesome and necessary for the public good.

"He has forbidden his Governors to pass Laws of immediate and pressing importance, unless suspended in their operation till his Assent should be obtained; and when so suspended, he has utterly neglected to attend to them."

[5] See, Debel, The Veto Power of the Governor of Illinois (1917), p. 11.

[6] See, 4 Elliot, Debates on the Federal Constitution, pp. 621 to 623.

toward the executive veto and it appears that now North Carolina is the only state that withholds the veto power entirely.[7]

The primary purpose of the framers of the Federal Constitution in granting an executive veto power appears to have been a desire to maintain the separation of the branches of government. The belief then current was that there is a tendency in free governments for the legislative branch to absorb all governmental power. The veto power was considered to be an integral part of the system of checks and balances designed to prevent constitutional abuses by a legislative majority.[8]

The presidential veto power (U. S. Const. art. I, § 7), phrased like Minn. Const. art. 4, § 11, was first used by George Washington in 1792 to veto a bill entitled, "An Act for an Apportionment of Representatives Among the Several States." However, the early presidents did not generally use the veto on matters of policy not involving constitutional problems.[9]

A second purpose for the veto power was discussed by the framers of the Constitution but was not recognized in practice until later. Alexander Hamilton favored the exercise of the veto power as a check upon hasty and unwise legislation, going beyond the question of constitutionality.[10] The development of the veto power has clearly led to its increased exercise for this purpose.[11] The power has been described as one of the most important attributes of the authority to which it is granted.[12]

The governor cannot change or modify a law by exercising his authority to veto. His control is negative in character.[13] By the terms of our

---

[7] See, Debel, *op. cit. supra* footnote 5, at p. 15; Index Digest of State Constitutions, Legislative Drafting Research Fund of Columbia University (2 ed.) pp. 610 to 614.

[8] See, Zinn, The Veto Power of the President, pp. 5 to 6; Debel, *op. cit. supra* footnote 5, at p. 25; Fairlie, The Veto Power of the State Governor, 11 Am. Pol. Sci. Rev. 473.

[9] Debel, *op. cit. supra* footnote 5, p. 25; Kelly & Harbison, The American Constitution (3 ed.) pp. 182, 231.

[10] See, Hamilton, The Federalist, No. 73.

[11] See, Fairlie, *supra* footnote 8; Debel, *op. cit. supra* footnote 5, at p. 25.

[12] See, Wilson, Congressional Government (15 ed.) p. 52.

[13] The definition of the veto as set out in Black, Law Dictionary (4 ed.) p.

constitution, the veto itself can be nullified if two-thirds of the members of each house vote to override it. It serves merely as a check by which the majority of a legislative body is caused to exercise the awesome power of lawmaking with due consideration for the interests of the minority. Of equal importance, the necessary public acceptance of a law is assured more definitely when legislation opposed by the chief executive has been confirmed by a two-thirds vote of both houses.

But to say that the governor has the power in some situations to veto laws passed by the legislature is not to say that he has the power to compel a concurrence of two-thirds of the membership of both houses in all instances where the legislature exercises authority granted it by our constitution. That there are limitations to the veto authority is implicit in the grant of the power as it appears in Minn. Const. art. 5, § 4, where the right of the governor to negative laws passed by the legislature is subject to the restriction that it must be "under such rules and limitations as are in this Constitution prescribed."

In State ex rel. Gardner v. Holm, 241 Minn. 125, 140, 62 N. W. (2d) 52, 62, we said in this connection:

"* * * At the time our United States Constitution was adopted the people were reluctant to grant to the executive a veto power over the acts of the legislature. At that time only one state had provided for a veto by the governor of legislative bills, namely, Massachusetts. New York had provided for a veto by a council of revision composed of the governor, the chancellor, and the judges of the supreme court, or any two of them together with governor. The veto power was not freely given to the governor in the early days of the commonwealths. As our country moved westward and our states were admitted to the Union, the people

---

1736, is as follows: "The refusal of assent by the executive officer whose assent is necessary to perfect a law which has been passed by the legislative body, and the message which is usually sent to such body by the executive, stating such refusal and the reasons therefor. It is either absolute or qualified, according as the effect of its exercise is either to destroy the bill finally, or to prevent its becoming law unless again passed by a stated proportion of votes or with other formalities."

responsible for framing their constitutions retained their reluctance to grant to the governor sweeping powers over the legislature."

From the foregoing, it follows that under our constitution the power of the governor to assert a qualified veto applies in some situations where the legislature has acted, but not in all. Where the legislature, moving pursuant to authority granted to it under the terms of the constitution, engages in the governmental function of lawmaking, its enactments are subject to the qualified veto. Where governmental functions essentially administrative in character are assigned to it as an entity, there are situations where the veto power does not apply. Analysis of State ex rel. Smiley v. Holm, 184 Minn. 228, 238 N. W. 494; Smiley v. Holm, 285 U. S. 355, 52 S. Ct. 397, 76 L. ed. 795; and State ex rel. Gardner v. Holm, *supra,* will demonstrate this proposition.

In State ex rel. Smiley v. Holm, *supra,* the question for consideration was whether the Legislature of the State of Minnesota had succeeded at its 1931 session in redistricting the state for the purpose of election of representatives to the Congress of the United States notwithstanding the fact that the governor had vetoed a legislative enactment which was not passed over his veto. The Minnesota Supreme Court held that the majority vote of the Senate and House of Representatives in redistricting the state for congressional purposes was effectual notwithstanding the veto. In arriving at this result our court reasoned:

(1) The power to prescribe boundaries for congressional districts rests exclusively in the language of U. S. Const. art. I, § 4, which provides: "The times, places and manner of holding elections for senators and representatives [to serve in the United States Congress] shall be prescribed in each state by the legislature thereof * * *."

(2) In delegating this authority to "the legislature" of each state, the framers of the Federal Constitution contemplated that the delegated authority would be exercised by that body or entity in each of the states in which the power to legislate was placed.

(3) In Minnesota the body or entity having the power to legislate under the Minnesota Constitution is the legislature consisting of the House of Representatives and the Senate.

(4) Article I, § 4, in delegating authority to a specific state body or entity to act as an agency in this state for the Federal government, does not call into play the lawmaking function of the state. For that reason, the provisions of the Minnesota Constitution relating to the power of the chief executive to veto enactments of the legislature in the exercise of this lawmaking function become irrelevant. Our court said in this connection (184 Minn. 238, 238 N. W. 499):

"* * * It [the legislature] merely gives expression as to district lines in aid of the election of certain federal officials; prescribing one of the essential details serving primarily the federal government and secondly the people of the state. The legislature is designated as a mere agency to discharge the particular duty. The governor's veto has no relation to such matters; that power pertains, under the state constitution, exclusively to state affairs."

The United States Supreme Court reversed our decision in Smiley v. Holm, 285 U. S. 355, 52 S. Ct. 397, 76 L. ed. 795. It reasoned that the direction appearing in U. S. Const. art. I, § 4, that congressional districts "shall be prescribed in each state by the legislature thereof" was not intended merely to assign a Federal chore to an ascertainable body of men (i. e., the legislature consisting of the House of Representatives and Senate of the State of Minnesota). Decision as to boundaries of congressional districts was assigned, according to its view, to the state's process of lawmaking. The United States Supreme Court then examined the constitutional provisions of our state governing the process by which statutory law is made and concluded that by the terms of the Minnesota Constitution the veto power is an essential ingredient of the lawmaking authority.

In short, the difference between the thinking of the Minnesota Supreme Court and that of the United States Supreme Court with respect to the problem posed in the Smiley case was this: Our court read U. S. Const. art. I, § 4, as delegating a Federal responsibility to an entity, i.e., the legislature which consists of the House of Representatives and the Senate. The United States Supreme Court, final arbiter of the meaning of the Federal Constitution, construed art. I, § 4, as assigning the task of re-

districting for the purpose of Federal elections not to an *entity* but to a *process,* that is, the process by which statutory law is made in the particular state exercising the delegated authority. It is this point of divergence in thinking as between the Minnesota Supreme Court and the United States Supreme Court which accounts for the difference in result. It is correct that the *entity* described by the words "the legislature" in the State of Minnesota consists of the House of Representatives and the Senate and does not include the governor. The *process* which is involved in the enactment of statutory law involves exercise of power delegated to the legislature as an entity either by a majority vote of each house or by a two-thirds majority of each house depending on whether the governor approves or disapproves of the legislation enacted.

It is to be assumed that the framers of our constitution would not place the veto power in the governor with respect to legislative action in some cases and not in others without good reason. If exceptions were to be made to the general authority to negative legislative action reposed in the governor, the basis of such exception, one would anticipate, should be either that the exercise of such authority by the chief executive would offend some other basic constitutional principle; or that the matter involved would lack that degree of statewide significance making the requirement of concurrence by two-thirds of each branch of the legislature necessary or desirable. These aspects of the matter will be considered further in paragraph 1d.

■ Apportionment has been defined as the division of a population into constituencies whose electors are to be charged with the selection of public officers.[14] Of necessity, the process involves (1) determination of boundary lines for each of the constituencies; (2) a resulting ratio of voters in each constituency to officers elected by such constituency; (3) a resulting comparable ratio of voters to elected officials as between every constituency and each of the others making up the whole; and (4) a total number of public officers to be selected depending on the number of constituencies established and the number of public officers to be chosen in each.

---

[14] See, de Grazia, *General Theory of Apportionment,* 17 Law and Contemporary Problems 256.

Legislative apportionment, of course, is the application of the apportionment process to the selection of legislators.

The whole object of legislative apportionment, in the language of this court appearing in our opinion in State ex rel. Meighen v. Weatherill, 125 Minn. 336, 341, 147 N. W. 105, 107, is—

"* * * to vest in the people rights that inherently belong to them, namely, *participation upon an equal footing in the affairs of the state.*" (Italics supplied.)

This same concept of the importance of apportionment to every person in the state has been expressed by the United States Supreme Court in its decisions, including Reynolds v. Sims, 377 U. S. 533, 564, 84 S. Ct. 1362, 1383, 12 L. ed. (2d) 506, 529, where it said:

"State legislatures are, historically, the fountainhead of representative government in this country. * * * But representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies. Most citizens can achieve this participation only as qualified voters through the election of legislators to represent them. *Full and effective participation by all citizens in state government requires, therefore, that each citizen have an equally effective voice in the election of members of his state legislature.* Modern and viable state government needs, and the Constitution demands, no less." (Italics supplied.)

So considered, it is difficult to conceive of any function of government more demanding of formal lawmaking process than that involved in apportionment.

It is a function which, of necessity, involves the exercise of political judgment and discretion on the part of the legislature. And where political judgment and discretion are used to formulate law there is, in the nature of things, a hazard that the decision of a simple majority, opposed by the chief executive, may have been unwise or hasty or, in rare cases, arbitrary or unreasonable. The fact that the legislators themselves are directly affected by apportionment does not reduce this hazard. So it is that if a qualified veto serves a useful purpose in any situation, the rea-

sons for it seem most compelling where apportionment is involved.

■ We come now to consideration of the language relating specifically to apportionment.

Minn. Const. art. 4, § 2, provides:

"The number of members who compose the Senate and House of Representatives *shall be prescribed by law* * * *. The representation in both houses shall be apportioned equally throughout the different sections of the State, in proportion to the population thereof * * *." (Italics supplied.)

Note that the subject of the first sentence is "[t]he number of members" who compose the legislature. That number is to be "prescribed by law." These words describe the lawmaking process, which includes the power of the governor to require concurrence of a two-thirds majority of both houses by exercising the qualified veto. By definition "apportionment" results in the fixing of the number of members to compose the legislature. This is so because the number of legislators is the product of the number of constituencies established and the number of public officers selected in each of them. To say that a bill which fixes the boundaries of legislative districts and designates the number of legislators to be selected from each does not prescribe "[t]he number of members who compose the Senate and House of Representatives" is to permit verbal form to obscure political fact. The legislature could alter the number of its members without affecting the representation ratio if it doubled the representatives and senators to be chosen from each of the established constituencies. But the likelihood of this is so remote that, for practical purposes, the prescription of the numbers and apportionment (equal or unequal) are inextricable.

The apparent purpose of the second sentence of art. 4, § 2, is to place a limit upon the lawmaking power granted by its first sentence so that the resulting representation will be equal throughout the different sections of the state in proportion to the population thereof. Two reasons, one semantic and the other rational, support this reading of the sentence: (a) Its subject is not "Representation" but instead "The representation." And "The representation" to be apportioned equally is that which results when the number of members is prescribed by law. (b) Except in

so far as the process by which the *number* established affects the right of voters to participate "upon an equal footing in the affairs of state," State ex rel. Meighen v. Weatherill, 125 Minn. 336, 341, 147 N. W. 105, 107, determination of what that number should be does not go to the essence of self-government. It is when the ratio of voters to elected representatives is fixed or altered as a result of the process that the right of every citizen to full and effective participation in state government becomes involved. It is illogical to say that the less significant function of determining the number of legislators should be subject to the qualified veto while the all-important function of apportionment of representation by the number so selected need not be.

Minn. Const. art. 4, § 23, as amended November 3, 1964, provides:

"The *legislature* shall have the power to *provide by law* for an enumeration of the inhabitants of this State, and also have the power at their first session after each enumeration of the inhabitants of this state made by the authority of the United States, *to prescribe the bounds* of congressional, senatorial and representative districts, and *to apportion* anew the senators and representatives among the several districts *according to the provisions of section second of this article.*" [15] (Italics supplied.)

By art. 4, § 23, the power of the legislature "to provide * * * for an enumeration of the inhabitants of this State" is subject to the executive veto, the words "by law" directly modifying the grant of power. This phrase, "by law," does not directly modify the grant of authority "to prescribe the bounds of * * * senatorial and representative districts, and to apportion anew the senators and representatives among the sev-

---

[15] Before the constitution was amended in 1964, Minn. Const. art. 4, § 23, read as follows:

"The legislature shall provide by law for an enumeration of the inhabitants of this State in the year one thousand eight hundred and sixty-five, and every tenth year thereafter. At their first session after each enumeration so made, and also at their first session after each enumeration made by the authority of the United States, the legislature shall have the power to prescribe the bounds of congressional, senatorial and representative districts, and to apportion anew the senators and representatives among the several districts according to the provisions of section second of this article."

eral districts." But the final phrase appearing in art. 4, § 23, directs that this be done "according to the provisions of section second of this article." We do not believe the framers of the constitution intended by this phrase to embrace only the art. 4, § 2, concept that apportionment should be equal throughout the different sections of the state in proportion to the population thereof. The more reasonable reading of it, we believe, would be to incorporate also by reference that part of art. 4, § 2, which directs that the mechanism be "by law." To do otherwise would be to attribute to the framers of the constitution an intent to make the routine legislative decision to enumerate the state's inhabitants a subject for the lawmaking process while exempting the vastly more important and politically significant matter of apportionment from the formalities required when a course of action is "prescribed by law."

Our prior decisions with respect to Minn. Const. art. 4, §§ 2 and 23, are not directly helpful. See, State ex rel. Meighen v. Weatherill, 125 Minn. 336, 147 N. W. 105; Smith v. Holm, 220 Minn. 486, 19 N. W. (2d) 914, 30 Minn. L. Rev. 37; and State ex rel. La Rose v. Tahash, 262 Minn. 552, 115 N. W. (2d) 687. We have discussed State ex rel. Smiley v. Holm, *supra;* for convenience of reference, a review of these other cases follows:

In State ex rel. Meighen v. Weatherill, *supra,* the reapportionment act of 1913 was attacked upon the ground that it violated our constitution in several respects, two of which were:

(1) That the legislature had no power or authority to reapportion the legislative districts at the 1913 session, that being the second session of the legislature subsequent to the last census.

(2) That the apportionment by the 1913 enactment was not equal throughout the state in proportion to the population thereof.

In dealing with the first contention the court noted that a Federal census had been taken and completed during the year 1910 and that although the legislature had convened in regular session in 1911, no reapportionment act was passed then. The argument advanced was that the authority of the legislature to reapportion ceased on the adjournment of that session in view of the provision of Minn. Const. art. 4, § 23, stating that the

legislature shall have power to prescribe the bounds of congressional, senatorial, and representative districts and to apportion anew the senators and representatives among the several districts "at their first session after each enumeration made by the authority of the United States." The court said (125 Minn. 339, 147 N. W. 106):

"* * * There is probably no doubt that, in the absence of some constitutional limitation upon the subject, the legislature would possess the power to redistrict the state at will, for that department is clothed with the right to exercise any and all powers of government where no restrictions are expressly or by necessary implication imposed by the Constitution. * * * And where a particular act of the legislature is questioned on constitutional grounds it is not the justification therefor that must be pointed out, but the clause or provision of the Constitution which prohibits its enactment."

The court then proceeded to consider the purpose of reapportionment legislation, declaring "the whole object thereof is to vest in the people rights that inherently belong to them, namely, *participation upon an equal footing in the affairs of the state.*" (Italics supplied.) 125 Minn. 341, 147 N. W. 107. The court concluded that to obviate a situation where the inherent rights of the people to participate in the affairs of the state upon an equal footing would be denied by the failure of the legislature to reapportion at a session of the legislature next following a census, the language of art. 4, § 23, should be "construed as imposing a duty of reapportionment" continuing until performed.

With respect to the second specification of constitutional objection, the court said (125 Minn. 342, 147 N. W. 107):

"* * * The matter of redistricting the state into congressional or legislative districts is so essentially administrative or legislative, restrained only by the Constitution, that the courts interfere therein only when there appears a clear and palpable violation of the fundamental law."

Smith v. Holm, 220 Minn. 486, 19 N. W. (2d) 914, 30 Minn. L. Rev. 37, involved an action for a declaratory judgment seeking determination that the legislative redistricting act of 1913 had become unconstitutional by reason of unequal representation resulting from growth of population

in various districts. Noting that the act had been found constitutionally acceptable in State ex rel. Meighen v. Weatherill, *supra,* this court stated the issue to be: Does the subsequent change in relative representation annul the provisions adjudged valid when enacted?

In disposing of the issue this court said (220 Minn. 491, 19 N. W. [2d] 916):

"* * * It is our opinion that a reapportionment act, valid when enacted, may not be held unconstitutional by reason of subsequent changes in the relative population of the districts, and that it continues in force until superseded by a valid act."

This disposition of the case was based essentially upon the ground that the power of apportionment having been placed by our constitution in the legislature, respect for the principle of division of governmental powers barred the judicial branch from intervening. The court said in this respect (220 Minn. 490, 19 N. W. [2d] 916):

"* * * The responsibility to heed the constitutional mandate to redistrict is laid upon the legislature, and it is, at most, only when as of the time of enactment there appears a clear and palpable violation of the fundamental law that the courts would have the power to upset the law."

In State ex rel. La Rose v. Tahash, 262 Minn. 552, 115 N. W. (2d) 687, one prosecuted for a criminal offense attacked the statute under which he was convicted upon the ground that Minn. Const. art. 4, §§ 2, 23, and 24, require periodical redistricting by the state legislature as a basis for legislative representation; that at the time of his trial and sentence this constitutional provision had not been complied with since 1913; and, therefore, that the legislation under which he was convicted, enacted in 1939 by the legislature, was invalid. Our court refused to hold the 1939 statute void upon the principle that an apportionment law constitutionally acceptable at the time of enactment remains valid notwithstanding population changes until superseded by a valid act.

This review of our prior decisions involving Minn. Const. art. 4, §§ 2 and 23, serves only to establish the absence of directly controlling precedent dealing specifically with these sections.

Apart from our decision in State ex rel. Gardner v. Holm, 241 Minn. 125, 62 N. W. (2d) 52, considered controlling by the trial court and relied upon by plaintiffs, it would seem reasonably clear that the power of the governor to assert a qualified veto extends to apportionment legislation, it being the case that (a) the existence of such authority accords with the general constitutional scheme of division of powers with checks and balances; (b) the constitution provides specifically for a qualified veto of "[e]very bill" (art. 4, § 11) and "[e]very order, resolution or vote requiring the concurrence of the two houses" (art. 4, § 12) and gives to the governor "a negative upon all laws passed by the legislature, under such rules and limitations as are in this Constitution prescribed" (art. 5, § 4); (c) the citizen's most precious civic right, that of participating upon an equal footing in the affairs of state, is affected by the process of apportionment; (d) the language of art. 4, §§ 2 and 23, considered together, leads to the conclusion that the power to apportion was committed by those who framed the constitution to the lawmaking process rather than to the legislature as an entity.

■ To all that has been said to this point, the irrefutable answer may be that our decision in State ex rel. Gardner v. Holm, 241 Minn. 125, 62 N.W. (2d) 52, compels affirmance.

The provision of the constitution being construed in that case, then Minn. Const. art. 6, § 6, read as follows:

"The judges of the supreme and district courts shall be men learned in the law, and shall receive such compensation at stated times as may be *prescribed by the legislature;* which compensation shall not be diminished during their continuance in office, but they shall receive no other fee or reward for their services." (Italics supplied.)

We said in the Gardner case (241 Minn. 133, 62 N. W. [2d] 58):

"In their wisdom the members of the constitutional convention obviously did not find it advisable to retain in the constitution a fixed compensation for either judges or the governor. It is significant, however, that they provided that the compensation of the judges should be 'prescribed by the legislature' but that as to all other officers, including the governor, it should be 'prescribed by law.'

"In framing our constitution the delegates had several courses open to them. They could keep the judicial branch of government completely independent of both the legislative and executive branch by fixing the compensation in the constitution itself, reserving unto the people the right to determine any change therein, as was done in several of the early constitutions of other states; they could grant to both the legislative and executive branches the same control over judicial salaries as they had over most other matters by providing that salaries should be fixed by law, as they did with respect to the compensation of all other constitutional officers; or they could give to the legislature plenary power to prescribe such compensation, thereby keeping the judicial branch of government independent of the executive. It is obvious that this last is what they did."

We have concluded that the Gardner case is not authority for plaintiffs' position because of the following differences between the problem there presented and the one with which we are now concerned:

(a) The function there involved, i. e., the fixing of salaries, is more administrative in character than legislative. Whether the salary of a state officer is in one amount or another involves an administrative rather than a political judgment. In contrast, the terms and conditions under which votes are cast and counted in a representative democracy goes to the heart of each citizen's relation to the state. The process by which these terms and conditions are fixed cannot be considered a mere problem of legislative administration.

(b) The underlying constitutional pattern of allocated power with each department having some check on the other is furthered by the qualified veto. In contrast, to have judicial salaries subject to the power of both the executive and legislative branches is to go beyond the needs of the situation and would serve to diminish the independence of the judiciary.

(c) The language of Minn. Const. art. 4, § 2, manifests an intent that the formal process of lawmaking be used when the ratio of votes to representation is established or altered. The words "to prescribe" in art. 4, § 23, referring to "the legislature" and its powers, although apt to describe a process short of formal lawmaking, are modified by the last phrase of that section. And since art. 4, § 2, is to be read as requiring the lawmaking process, the same formalities must be incorporated into art.

4, § 23, in order that the prescription of boundaries and new apportionment be achieved "according to the provisions of section second of this article." In contrast, the words "prescribed by the legislature" were used in art. 6, § 6, without any such reference to any other constitutional provision directing that the prescription be "by law."

(d) The interpretation of art. 6, § 6, accepted in the Gardner case did not produce incongruities. The fact that the interpretation makes good sense was confirmed when a majority of those voting at the 1956 election manifested approval of the result reached there. See, Minn. Const. art. 6, § 7. On the other hand, to say that the constitution allows the legislature alone to fix the boundaries of legislative districts without the check of a qualified veto would be to embrace an incongruous situation in this— legislative action fixing or changing the boundary lines of lesser units of state government such as townships, counties, municipalities, judicial districts, and school districts would be subject to the qualified veto, while a mere majority of the legislature would be able to alter the boundaries of those districts from which members of the legislature, the primary lawmaking authority, are chosen. To accept such a result would be to say that the more fundamental the citizen's right, the less the need for a check on the power of the majority when exercised with respect to it. This result seems neither logical nor intended.

It is our conclusion that the language used by the framers of the constitution in dealing with the problem of apportionment, read in light of the other pertinent provisions of that document, gives to the governor the power to require a two-thirds majority of both houses in order to give to apportionment legislation the effect of law. From this it follows that the decision of the trial court must be reversed.

■ Our decision here is not intended to be an evaluation of the merits of S. F. 102 or of the veto which nullified it. Deciding that the executive power to assert a qualified veto was put in the constitution as a check upon the power of the legislature to redistrict and apportion does not imply that the use of the veto in this particular case was or was not prudent. For us to intimate one way or another on this subject would be to exceed the clear limits of our judicial responsibility. Our only duty in this situation is to decide whether the power to veto exists with respect to

apportionment legislation. For the reasons given, we have concluded that it does. At that point our duty and our opinion ends.

Reversed.

KNUTSON, CHIEF JUSTICE (dissenting).

I cannot agree with the result arrived at in the majority opinion. In my opinion, the case is controlled by State ex rel. Smiley v. Holm, 184 Minn. 228, 238 N. W. 494, and State ex rel. Gardner v. Holm, 241 Minn. 125, 62 N. W. (2d) 52. It is true that we were forced to accept the construction of our constitution that the United States Supreme Court saw fit to place upon it in Smiley v. Holm, 285 U. S. 355, 52 S. Ct. 397, 76 L. ed. 795, for the reason that the case involved a construction of the Federal Constitution and the decision of the Federal court was binding upon us in that area. As far as our construction of the language of our constitution is concerned, what we said in State ex rel. Smiley v. Holm, *supra,* still controls in the areas where the Federal Constitution is not involved. We so held in the Gardner case in these words (241 Minn. 137, 62 N. W. [2d] 60):

"* * * [O]ur construction of our own constitution is controlling, and the construction placed thereon in the Smiley case still stands as far as it relates exclusively to our fundamental law."

However, aside from the Smiley case, the language construed in the Gardner case is identical to that now before us. It cannot be that the framers of our constitution intended this language to have one meaning when they dealt with judicial salaries and an entirely different meaning when they dealt with other matters. If we were right in the Gardner case, and I think we were, we should adhere to the construction placed on the same language now before us in that case. Reference to Minn. Const. art. 4, §§ 2 and 23, prior to its amendment in 1964 can hardly lead to any other conclusion. In § 2, the provision relating to the fixing of the number of members of the Senate and House of Representatives was in a separate sentence from that providing for apportionment of the number so fixed among the various parts of the state. Section 23 provided specifically that the legislature should *provide by law* for an enumeration of the inhabitants of the state and that *"the legislature shall* have the power to

*prescribe* the bounds of congressional, senatorial and representative districts, and to apportion anew the senators and representatives among the several districts" of the state. (Italics supplied.) When the article was amended in 1964, § 23 was changed to read: *"The legislature shall have the power to provide by law* for an enumeration of the inhabitants of this State, and also have the power at their first session after each enumeration of the inhabitants of this state made by the authority of the United States, to prescribe the bounds of congressional, senatorial and representative districts, and to apportion anew the senators and representatives among the several districts according to the provisions of section second of this article." (Italics supplied.) The language in § 2 remained as it was—that the number of senators and representatives should be prescribed by law. In so far as the matter now before us is concerned, § 23 as amended has the same meaning as if it read: "The legislature shall have the power to provide by law for an enumeration of the inhabitants of the state, and the legislature shall have the power to prescribe the bounds of congressional, senatorial and representative districts."

There can be little doubt that the legislature understood the difference in the language of the two provisions after the Gardner case. It is interesting to note that a constitutional commission was established by L. 1947, c. 614, to study the need for constitutional revision. It was composed of many eminent men and women, and made its report to the legislature in 1948. With respect to the judiciary article, which was Minn. Const. art. 6, the commission proposed that the language of § 8 provide in part: "The compensation of all justices and judges, which shall not be diminished during their term of office, shall be *prescribed by law."* (Italics supplied.) The Gardner case was decided on January 29, 1954. The proposed amendment of the judiciary article came before the legislature at its 1955 session and, obviously as a result of the Gardner case, art. 6, § 7, as proposed by the legislature read in part: "The compensation of all judges shall be *prescribed by the legislature* and shall not be diminished during their term of office." (Italics supplied.) This change retained the result obtained by the Gardner case. Even more interesting were the changes made in a schedule attached at the end of the judiciary article. Paragraph (e) of the commission's schedule read: "Sal-

ary schedules in effect when this Article is adopted, for the compensation of judges, court commissioners, clerks of court, and other court employees, shall remain in effect until otherwise *provided by law.*" (Italics supplied.) The bill as drafted and as introduced in the legislature was identical to the report of the commission. As such it passed the House [1] and was sent to the Senate. The Senate passed it without amendment and returned it to the House [2] but later recalled it from the House.[3] Upon recall of the bill, the Senate amended paragraph (e) of the schedule, which had become paragraph (d) in the bill, to read as follows:

"Salary schedules, in effect when this Article takes effect for the compensation of judges, court commissioners, clerks of court, and other court employees, shall remain in effect until otherwise *prescribed by the legislature or provided by law.*" (Italics supplied.)

It is clearly evident that the legislature understood the difference in meaning between "prescribed by the legislature" and "provided by law."

Should we then assume that when art. 4, dealing with the legislature, was amended in 1964 the legislature no longer realized the difference in this language? It strikes me that to so find would unjustifiably ascribe to the legislature an ignorance of what they had done in prior years. In proposing an amendment to our judiciary article in 1955, which was adopted by the people in 1956, the legislature had ample opportunity to change the interpretation of the language we were confronted with in Gardner, and are confronted with now, if it had desired or intended to do so. The legislature not having done so, we must assume that both they and the people were satisfied with the construction we had placed on this language. It cannot be successfully argued that it was not deliberately retained, at least by the legislature, when they drafted and passed the proposal to amend our judiciary article. I think the same is true when the article dealing with the legislature was amended in 1964.

Nor can I agree that there is no logical difference between fixing the number of senators and representatives and apportioning them among

---

[1] See, Journal of the House, 1955, pp. 1282 to 1283.

[2] See, Journal of the Senate, 1955, pp. 1417 to 1418.

[3] See, Journal of the Senate, 1955, p. 1500.

the various districts of the state. Much the same reasons exist for requiring the lawmaking process to be used in the one instance and leaving it to the legislature alone in the other as existed in the Gardner case. The number of senators and representatives affects directly the cost of operating the legislature. In this area the same considerations exist as in any appropriation of money for state purposes. That is not necessarily so in apportioning the number so fixed among the various sections of the state. Here there is a constitutional mandate that the boundaries of the districts shall be so drawn that the members of the legislature shall be apportioned as nearly equally on a basis of population as can reasonably be accomplished. That function involves an entirely different process and can be performed by the legislature alone. To permit the governor to veto the action of the legislature in performing this function makes it more difficult to accomplish the necessary redistricting and sometimes makes it virtually impossible to reach agreement when the governor and the majority of the legislature are at odds politically.

The historical background of the language involved here has been fully explored in Smiley and Gardner, and I see no need of retreading that ground in order to find an escape route along a different path from that which we have heretofore followed in order to arrive at a result which is inconsistent with that reached by our former decisions. Our function in this case, as it is in all cases involving constitutional interpretation, is limited to determining, as best we can, what the language used in the constitution means. Here, more than anywhere else, it is important that our decisions be consistent and that, once having construed specific language in our constitution, we adhere to the meaning placed on it unless we are convinced that we were originally in error. It is not our concern whether the meaning is popular or not, nor is it our concern whether the construction contended for by one group or another will further the political ambitions of anyone.

There are other areas where the legislature under our constitution operates without concurrence of the governor. As we pointed out in Gardner, one of these areas is the selection of the Board of Regents of the University of Minnesota. The case of State ex rel. Peterson v. Quinlivan, 198 Minn. 65, 268 N. W. 858, clearly points this out and holds

that an attempt by the legislature to provide by law that the governor make such appointments was unconstitutional. Again, in Minn. Const. art. 14, § 1, dealing with the amendment of our constitution itself, the proposal to amend comes from the legislature. The governor has no power to veto such proposal. With respect to approval or rejection by the people, however, the section provides that it shall be "in a manner to be provided by law." Thus it is apparent that it is not uncommon that one act be done by the legislature alone and another be subject to the governor's veto to accomplish a single purpose.

There may be still other areas where the governor has no veto power over the actions of the legislature. Those we have mentioned are sufficient to demonstrate that the framers of our constitution used the term "provided by law" understandingly when they intended that the lawmaking process should apply in the article now before us as well as in the judiciary article and elsewhere.

I think the decision of the trial court should be affirmed.

OTIS, JUSTICE (dissenting).
I join in the dissent of Mr. Chief Justice Knutson.

NELSON, JUSTICE (dissenting).
I join in the dissent of Mr. Chief Justice Knutson.

