James **EMISON**, Judy Fairbanks, Marie Iverson, Ken Dean, Steve Castillo, Lew Freeman, and Yao Lo, individually and on behalf of all Citizens and Voters of the State of Minnesota similarly situated, Plaintiffs,

and

Patricia **Cotlow**, Phillip Krass, Sharon LaComb, James Stein, and Theodore Suss, individually and on behalf of all Citizens of Minnesota similarly situated, Intervening Plaintiffs,

v.

Joan **GROWE**, Secretary of State of the State of Minnesota; Mark Lundgren, Carver County Auditor, individually and on behalf of all County Auditors of the State of Minnesota, Defendants,

and

The Seventy-seventh Minnesota State House of Representatives; and the Seventy-seventh Minnesota State Senate, Defendants Intervenors,

and

Patrick **O'Connor**, Hennepin County Auditor, individually and on behalf of all County Auditors of the State of Minnesota, Defendant Intervenor.

Duane **BENSON**, Terry Dempsey, Delores Hettig, Richard Harmon, David E. Peterson, E.M. Patricia Pidcock, and Frank Ringsmuth, Plaintiffs,

v.

Joan **GROWE**, Secretary of State of the State of Minnesota, Defendant,

and

Patrick **O'Connor**, Hennepin County Auditor, individually and on behalf of all County Auditors of the State of Minnesota, Defendant Intervenor.

Civ. No. 4–91–202.

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 19, 1992.

Certiorari Denied March 30, 1992.

See 112 S.Ct. 1557.

Before LAY, Circuit Judge, MacLAUGHLIN, District Judge, and MAGNUSON, District Judge.

## MEMORANDUM OPINION AND ORDER

LAY, Circuit Judge, and MAGNUSON, District Judge.

In 1982, this court established Minnesota's congressional districts, *see LaComb v. Growe,* 541 F.Supp. 145 (D.Minn.), *aff'd sub nom. Orwoll v. LaComb,* 456 U.S. 966, 102 S.Ct. 2228, 72 L.Ed.2d 841 (1982), and Minnesota's state legislative districts, *see LaComb v. Growe,* 541 F.Supp. 160 (D.Minn.1982), as reflected in Minnesota Statutes §§ 2.019, 2.042, 2.702 (1983). At that time, this court also established minority concentrated districts in an attempt to preserve the voting strength of minority populations.

Over the last ten years, substantial population shifts from the northern part of Minnesota to the suburbs of the Twin Cities metropolitan area have resulted in great population disparities among the state's current legislative districts. For example, suburban Senate District 48 contains 104,235 people, while Senate District 6, in the northern part of the state, contains only 50,659 people.[1] Thirty-four of the sixty-seven senate districts deviate from the ideal population of 65,300 by 10% or more.[2] Eleven of the sixty-seven districts deviate from the ideal population by 20% or more.[3] The congressional districts exhibit serious disparity as well. For example, surburban Congressional District 3 contains 668,263 people, while District 2, located outside the metropolitan area, contains only 480,079 people.[4]

On March 18, 1991, James Emison, a Caucasian resident of Hennepin County; Judy Fairbanks, a Native American resident of the White Earth Reservation in Becker County; Marie Iverson, a Caucasian resident of Dakota County; Ken Dean, a Caucasian resident of Stearns County; Steve Castillo, a Hispanic resident of Ramsey County; Lew Freeman, an African–American resident of District 60B in south Minneapolis; and Yao Lo, an Asian resident of Ramsey County, brought this action in federal district court challenging the constitutionality of the 1982 congressional districts and the 1983 state legislative districts. The suit was brought against Joan Growe, Secretary of State, and Mark Lundgren, Carver County Auditor, individually and on behalf of all Minnesota county auditors.

The Emison plaintiffs allege that the 1982 congressional districting laws violate Article 1, § 2 of the United States Constitution; and that the 1983 state legislative districting laws violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Emison plaintiffs further allege that the 1983 state legislative districting laws violate Section 2 of the federal Voting Rights Act, 42 U.S.C. § 1973 (1988).[5] They claim that

1. These figures are from the House District Population Report for 1990, dated July 30, 1991, distributed to the federal district court's Special Masters Panel by the Minnesota State Redistricting System Administrator on September 16, 1991. Pursuant to Fed.R.App.P. 10(e), any party desiring to file with the clerk of the court any materials distributed at that meeting is hereby authorized to do so within seven days.

2. *Id.*

3. *Id.*

4. These congressional district population figures originate from the 1990 Census of Population

and Housing data prepared by the United States Bureau of the Census. A stipulation of parties regarding this information was filed with the federal district court on October 10, 1991, and obtained for the court's use through the computer and accompanying programs provided by the State of Minnesota.

5. In January, 1991, Patricia Cotlow and other plaintiffs brought an action in Hennepin County District Court challenging the constitutionality of the state legislative redistricting statutes, Minn.Stat. §§ 2.019, 2.042, 2.702 (1990), and the congressional redistricting plan set forth in *LaComb v. Growe,* 541 F.Supp. 145 (D.Minn.1982).

these districting laws unnecessarily fragment the White Earth and Red Lake reservations into four separate legislative districts. The plaintiffs assert that such fragmentation minimizes, cancels out, and dilutes effective participation in the political process by Native Americans residing on or near those reservations, thereby denying them equal opportunity to elect or influence the election of representatives of their choice in violation of the Voting Rights Act. The Emison plaintiffs also allege that the legislative districts in the City of Minneapolis unnecessarily fragment the minority population into multiple districts so as to minimize, cancel out, and dilute the effective participation in the political process by minorities, thereby denying them equal opportunity to elect or influence the election of representatives of their choice in violation of the Voting Rights Act.

The plaintiffs ask the court for declaratory and injunctive relief barring the use of the districts for future elections. They also seek the adoption of new districts that consolidate the White Earth and Red Lake Reservations in a single legislative district, as well as consolidate minority populations in south Minneapolis with adjacent or nearby minority populations.

This court has subject matter jurisdiction under Title 28 U.S.C. § 1343,[6] as well as under Title 28 U.S.C. § 1331 and Title 42 U.S.C. § 1973.[7]

On April 8, 1991, a three-judge district court panel was designated pursuant to 28 U.S.C. § 2284(a) (1988).[8] On May 16, 1991, a motion to intervene in this action was granted to the Seventy-seventh Minnesota State House of Representatives and State Senate (hereafter referred to as the defendant intervenors).[9]

Once convened, the jurisdiction of a three-judge panel under 28 U.S.C. § 2284(a) "extends to every question involved, whether of state or federal law, and enables the court to rest its judgment on the decisions of such of the questions as in its opinion effectively dispose of the case." *Armour v. State of Ohio*, 775 F.Supp. 1044, 1048 (N.D.Ohio 1991) (quoting *Sterling v. Constantin*, 287 U.S. 378, 393–94,

---

*See Cotlow v. Growe*, No. C8–91–985 (Minn.Special Redistricting Panel filed Jan., 1991). This complaint did not allege any violation of the Voting Rights Act under 42 U.S.C. § 1973.

**6.** Title 28 U.S.C. § 1343 provides in relevant part:

(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

\* \* \* \* \* \*

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

28 U.S.C. § 1343(a)(3) and (4) (1988).

**7.** Title 28, U.S.C. § 1331(a) reads as follows:

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

28 U.S.C. § 1331(a) (1988).

Title 42, U.S.C. § 1973(a) states:

No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement or the right of any citizen or the United States to vote on account of race or color....

42 U.S.C. § 1973(a) (1988).

**8.** Title 28 U.S.C. § 2284(a) reads as follows:

(a) A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body.

In June, 1991, the Chief Justice of the Supreme Court of Minnesota assigned the *Cotlow* action to a three-judge court under his general constitutional authority to move and transfer judges from one district to another. *See* Minn. Stat. § 2.724, subd. 1 (1991).

**9.** Throughout this litigation the Emison plaintiffs and the Benson plaintiffs, *infra*, have represented the interests of the Independent–Republican (IR) political party. The legislative intervenors represent the interests of the Democratic–Farmer–Labor (DFL) political party. The Cotlow intervenors are aligned with the interests of the defendant intervenors. For purposes of identification within this opinion, we refer only to the parties as the Emison plaintiffs, the State, and the defendant intervenors.

53 S.Ct. 190, 193, 77 L.Ed. 375 (1932)). Accordingly, this court now addresses the issues we must consider in affording complete relief to the plaintiffs. To this end, we adopt state legislative and congressional redistricting plans prepared by the court with the assistance of a Special Masters panel,[10] which are attached to this opinion as Sections II and IV.

On May 18, 1991, the Minnesota Legislature passed a state legislative redistricting bill, Chapter 246. The enrolled bill was presented to Governor Arne H. Carlson on May 24, 1991, who vetoed the legislation on May 28, 1991. A suit was thereafter commenced in the Ramsey County District Court alleging the Governor's veto was not effective because it had not been delivered to the legislative house of origin within the time required by the Minnesota Constitution.[11] The state district court ruled on August 2, 1991, that the Governor's veto was ineffective. The Governor did not appeal this ruling, and Chapter 246 became law. On August 9, 1991, a separate suit was commenced in federal district court challenging the constitutionality of Chapter 246.[12] This court subsequently consolidated the *Emison* and *Benson* cases.[13]

■ On August 21, 1991, this court unanimously entered an order which denied a motion to enjoin the state district court proceedings, granted a motion to defer its own proceedings pending further legislative action, and denied a motion to abstain pending further state court proceedings.[14] In doing so, we were guided by the opinion of the Supreme Court in *Scott v. Germano*, 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965), which stated that a federal district court should not prematurely adopt a redistricting plan of its own, but should

> enter an order fixing a reasonable time within which the appropriate agencies of the State of Illinois, including its Supreme Court, may validly redistrict the Illinois State Senate; provided that the same be accomplished within ample time to permit such plan to be utilized in the 1966 election....
>
> The District Court shall retain jurisdiction of the case and in the event a valid reapportionment plan for the State Senate is not timely adopted it may enter such orders as it deems appropriate, including an order for a valid reapportionment plan....

381 U.S. at 409, 85 S.Ct. at 1527. Our order recognized that *Germano* rests the primary responsibility for redistricting with the state legislative process.[15] *Id.* Counsel for the defendant intervenors represent-

---

**10.** On August 27, 1991, the three-judge federal district court panel appointed three Special Masters, pursuant to Fed.R.Civ.P. 53, in order to assist the court in evaluating the redistricting issues presented.

**11.** See *The Seventy-seventh Minnesota State Senate and Seventy-seventh Minnesota State House of Representatives v. Carlson*, No. C3–91–7547 (Ramsey County Dist. Ct. Aug. 2, 1991).

**12.** *Benson v. Growe*, No. 4–91–603 (D.Minn. filed Aug. 9, 1991).

**13.** *Emison*, No. 4–91–202 (D.Minn. Sept. 25, 1991) (Order Establishing Master Docket).

**14.** *Emison*, No. 4–91–202 (D.Minn. Aug. 21, 1991) (Memorandum and Order at 10–11).

**15.** In discussing the state legislative process, the Minnesota Supreme Court has recognized:

> Our court read U.S. Const. art. I, § 4, as delegating a Federal responsibility to an entity, i.e., the legislature which consists of the House of Representatives and the Senate.

The United States Supreme Court, final arbiter of the meaning of the Federal Constitution, construed art. I, § 4, as assigning the task of redistricting for the purpose of Federal elections not to an *entity* but to a *process*, that is, the process by which statutory law is made in the particular state exercising the delegated authority. It is this point of divergence in thinking as between the Minnesota Supreme Court and the United States Supreme Court which accounts for the difference in result. It is correct that the *entity* described by the words "the legislature" in the State of Minnesota consists of the House of Representatives and the Senate and does not include the governor. The *process* which is involved in the enactment of statutory law involves exercise of power delegated to the legislature as an entity either by a majority vote of each house or by a two-thirds majority of each house depending on whether the governor approves or disapproves of the legislation enacted. *Duxbury v. Donovan,* 272 Minn. 424, 432–33, 138 N.W.2d 692, 698 (1965) (discussing *Smiley v. Holm*, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932)).

ed to this court in August, 1991, that the legislature planned to amend Chapter 246 and pass a congressional plan when the session reconvened in January, 1992. Following the principles of *Germano*, this court thus deferred to the state agencies in order to allow them every opportunity to pass a redistricting law no later than January 20, 1992.[16]

This court refused to abstain, however, and we retained jurisdiction over the case for two reasons. First, we recognized that this court's jurisdiction was invoked under the Voting Rights Act. Proof of a violation could directly affect any state redistricting plan that might be adopted.[17] Second, this court determined that the state court's appellate process would take too long to allow a valid plan to be approved and implemented in time for the 1992 election.

All parties agreed that a redistricting plan should be implemented in early February, and in any event no later than March 1, 1992. This court was cognizant that if the state district court issued a final opinion after the legislature recessed in January, 1992, an appeal to the Supreme Court of Minnesota would likely not be completed by March 1, 1992.[18]

We concluded that if the state legislative process failed to adopt a redistricting plan by January 20, 1992, this court would then be obligated to review the allegations under the Voting Rights Act, and if necessary provide equitable relief by adoption of its own plan.[19] We recognized that in the event the state agencies did not act, the development of a plan and an appropriate order would require additional time. Contingent upon any eleventh hour action of the legislature, we appointed the three Special Masters to assist this court in studying and ascertaining the constitutionality of all plans proposed.[20]

On November 21, 1991, the state district court issued a preliminary order for state

**16.** *Emison,* No. 4–91–202 (D.Minn. Aug. 21, 1991) (Memorandum and Order at 10–11).

**17.** In our order of August 21, 1991, we noted that the federal complaint contained issues relating to the Voting Rights Act, whereas the state court action in *Cotlow* did not. In refusing to send the minority plaintiffs to state court we adhered to fundamental principles governing abstention in voting rights cases. The Supreme Court has observed:

"[R]ecognition of the role of state courts as the final expositors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law." *England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 415–16 [84 S.Ct. 461, 465, 11 L.Ed.2d 440].

. . . .

"[T]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555 [84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964)]. The right is fundamental "because preservative of all rights." *Yick Wo v. Hopkins,* 118 U.S. 356, 370 [6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886)]. ... Given the importance and immediacy of the problem, and the delay inherent in referring questions of state law to state tribunals, it is evident that the District Court did not abuse its discretion in refusing to abstain. *Griffin v. County School Board of Prince Edward County,* 377 U.S. 218, 229 [84

S.Ct. 1226, 1232, 12 L.Ed.2d 256 (1964)]; *Baggett v. Bullitt,* 377 U.S. 360, 375–379 [84 S.Ct. 1316, 1324–27, 12 L.Ed.2d 377 (1964)].

*Harman v. Forssenius,* 380 U.S. 528, 535, 537, 85 S.Ct. 1177, 1182, 1183, 14 L.Ed.2d 50 (1965) (footnote omitted); *see also Badham v. United States Dist. Court for the N. Dist. of Cal.,* 721 F.2d 1170, 1173 (9th Cir.1983) ("The dangers posed by an abstention order are particularly evident in voting cases.... 'Other rights, even the most basic, are illusory if the right to vote is undermined.'") (quoting *Wesberry v. Sanders,* 376 U.S. 1, 17 [84 S.Ct. 526, 534, 11 L.Ed.2d 481] (1964)); *Edwards v. Sammons,* 437 F.2d 1240, 1244 (5th Cir.1971) (indicating that delay caused by abstention is not to be countenanced in cases involving the right to vote).

**18.** When a final judgment is entered in the state court proceeding, the parties have ninety days in which to take an appeal. Minn.R.Civ.App.P. 104.01 (1991). At the time this order is entered, the state district court has not issued a final order as to any congressional redistricting. As a result, the time to appeal a congressional plan in the state court conceivably will not expire until late May of 1992.

**19.** *Emison,* No. 4–91–202 (D.Minn. Aug. 21, 1991) (Memorandum and Order at 10–11).

**20.** Since our order of appointment in August of 1991, the masters have expended approximately 1500 hours in the complex review of all plans.

legislative redistricting.[21] The court declared, however, that it would not implement its plan if the legislature passed a redistricting plan in January, 1992. Despite the contingent nature of the state district court's plan, it announced, "by proceeding as swiftly as possible, we intend to provide any time necessary for an orderly appeal process and to avoid any duplicative litigation in the federal courts."[22] The state district court simply adopted, with a few modifications, Senate File 1596, which represents the DFL legislative party's amended plan of Chapter 246.[23] This was, as will be discussed, essentially the same plan which was on January 9, 1992, passed by the legislature but vetoed by the Governor.

By issuing its plan prior to the anticipated legislative redistricting action in January, 1992, we deemed it self-evident that the existence of the state district court plan could improperly influence and interfere with the legislative process. The premature issuance of such a plan prevented the occurrence of any possible compromise or negotiation which might have brought a divided state government to some form of agreement on redistricting. This court also was apprehensive about the apparent finality of the state court proceedings at that time, believing that meaningful review of the federal voting rights claims asserted

only in the federal proceedings would be prevented. For these reasons, this court enjoined all further state proceedings and stayed the effect of the orders issued by the state district court in *Cotlow*.[24]

On December 9, 1991, the state district court proceeded to adopt its legislative redistricting plan,

> subject to the stay issued by the United States District Court in *Emison v. Growe*, No. 4–91–202 (D.Minn. Dec. 5, 1991), and in conformity with Minn. R.Civ.P. 54.02 the following reapportionment of the Minnesota Legislature shall be final and effective beginning with the 1992 primary and general elections, unless a constitutional plan is enacted by the State of Minnesota.

*Cotlow*, No. C8–91–985 (Minn. Special Redistricting Panel Dec. 9, 1991) (Findings of Fact, Conclusions of Law, and Order for Judgment on Legislative Redistricting at 12). The court did not order any injunctive relief.[25] *Id.* at 12–13.

On January 9, 1992, the Minnesota legislature passed amendments which special legislative redistricting committees had worked on since August, 1991. Senate File 1596. These were presented to the legislature in an attempt to cure the infirmities alleged to exist in Chapter 246. The legislature also passed a congressional redis-

---

**21.** *Cotlow*, No. C8–91–985 (Minn.Special Redistricting Panel Nov. 21, 1991) (Findings of Fact, Conclusions of Law, and Preliminary Order for Judgment on Legislative Redistricting).

**22.** *Id.* at 16.

**23.** In its Pretrial Order No. 4, the state district court panel adopted an additional criterion for evaluating proposed redistricting plans, stating that all plans must follow the contours of the previously declared unconstitutional Chapter 246. *Cotlow*, No. C8–91–985 (Minn.Special Redistricting Panel, Oct. 1, 1991) (Pretrial Order No. 4, at 8). Upon the announcement of the adoption of this criterion, a state legislative aide to the Democratic–Farmer–Labor party felt compelled to proclaim, "It's all over. We won." Robert Whereatt, *DFL Wins Round in Redistricting Fight*, Minneapolis Star Tribune, Oct. 2, 1991, at 3Be.

**24.** *Emison*, No. 4–91–202 (D.Minn. Dec. 5, 1991) (Order of Stay of All Proceedings Before the

Minnesota Special Redistricting Panel in *Cotlow v. Growe*, No. C8–91–985).

**25.** At the time this opinion is released, it appears the state district court order of December 9, 1991, adopting a state legislative redistricting plan is not yet a final order. Minnesota Rule of Civil Procedure 54.02 provides:

> the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

The Supreme Court of Minnesota has held that when a trial court issues an order disposing of fewer than all claims of all parties and does not make an "express determination that there is no just reason for delay," *Pederson v. Rose Co-Op. Creamery Ass'n*, 326 N.W.2d 657, 660–61 (Minn. 1982), the order does not become final and is subject to revision at any time prior to entry of judgment adjudicating all claims and is therefore not appealable of right. *Id.*

tricting plan on the same date. Senate File 1597. Governor Carlson promptly vetoed both redistricting bills on January 9, 1992.[26]

In addressing this issue of redistricting, we emphasize that this court does not sit in judgment as an appellate court for the state district court. Thus, our review is not of the state district court action. We also recognize that if any error was made by this court on August 21, 1991, in refusing to abstain because of the voting rights allegations existing in the federal complaint, or if we abused our discretion in adopting January 20, 1992, as the time frame in which the state agencies could act to adopt a valid redistricting plan, then by our action today the parties are well aware that appeal to the Supreme Court of the United States will initiate consideration and any necessary correction of perceived mistakes.

■ This court fully recognizes the deference that should be given to state courts in state redistricting proceedings. However, where federal issues exist independently and the state judicial processes will cause untimely delay, both *Scott v. Germano* and *Harman v. Forssenius*, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965), place the primary obligation on a federal court to act. A state's supreme court is, and should be, the final arbiter of claims resting on state law. Likewise, state courts may resolve federal statutory and constitutional issues, at least where Congress has not committed such matters

to the exclusive jurisdiction of the federal courts. It is equally true, however, that the United States Supreme Court is the final arbiter of federal statutory and constitutional law. As we have previously indicated, "recognition of the role of state courts as the final expositors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law." *Harman v. Forssenius*, 380 U.S. at 535, 85 S.Ct. at 1182 (quoting *England v. Louisiana State Bd. of Medical Examiners*, 375 U.S. 411, 415–16, 84 S.Ct. 461, 464–65, 11 L.Ed.2d 440 (1964)).

We now turn to the issues of redistricting on both the state and congressional level. We initially address plaintiffs' complaint relating to violation of the Voting Rights Act.

*Voting Rights Act*

Generally, Section 2 of the Voting Rights Act prohibits a state from using any standard, practice or procedure in a manner which results in the denial or abridgement of the right to vote on account of race or color.[27] The practice the Emison plaintiffs challenge relates to the legislative district boundaries near the Red Lake and White Earth reservations and in the City of Minneapolis. The Emison plaintiffs urge us to create a super-majority senate district in Minneapolis which combines the substantial minority populations from the near north side with the minority populations in central and south Minneapolis.

**26.** On January 10, 1992, after the legislature had acted and the Governor had vetoed the legislation, the United States Supreme Court vacated our order of December 5, 1991, lifting the injunction on the *Cotlow* parties and dissolving the stay as to the state court orders. *Cotlow v. Emison*, No. 91–1084 (Supreme Court of the United States Jan. 10, 1992) (Order dissolving injunction). The defendant intervenors now urge that the dissolution of the injunction by the Supreme Court implicitly calls for this court to abstain from further action and allow the state court to proceed. We disagree. As set forth in our order of December 5, 1991, the narrow purpose of the injunction was to prevent finality of the state court action prior to the time the legislature acted. When the Supreme Court dissolved the injunction, the purpose of the injunction had been fulfilled. An appellate court does not work in a vacuum without a record or

briefs from both sides. To urge that the Supreme Court intended to decide the complex federalism issues we now address without a plenary record and hearing demeans the appellate process.

**27.** Section 2(a) of the Voting Rights Act states:

No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in Section 1973b(f)(2) of this title [relating to language minorities], as provided in subsection (b) of this section.

42 U.S.C. § 1973(a) (1988).

■ Section 2 goes on to explain how a party establishes that a practice results in an illegal abridgement of the right to vote. A violation of Section 2(a) occurs if, in the totality of the circumstances, the political processes leading to nomination or election are not equally open to participation by members of a protected class. This lack of equal access exists if minority members have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b) (1988). The statute provides that the extent to which minority members have been elected to office may be considered in determining whether a violation has occurred, but also provides there is no right to have members of the protected class elected in numbers equal to their proportion in the population.[28]

We initially recognize that "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964). We are further guided by the Supreme Court's admonition that the Voting Rights Act "should be interpreted in a manner that provides 'the broadest possible scope' in combatting racial discrimination." *Chisom v. Roemer*, —— U.S. ——, 111 S.Ct. 2354, 2368, 115 L.Ed.2d 348 (1991) (quoting *Allen v. State Board of Elections*, 393 U.S. 544, 567, 89 S.Ct. 817, 832, 22 L.Ed.2d 1 (1969)).

■ First we address the argument that plaintiffs' claims are precluded by the reasoning of *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In doing so, we deem it essential to make clear that the fundamental issue we face is whether voting rights violations have been proven in this case. The question is not whether any given plan complies with the Voting Rights Act. Nothing in the Voting Rights Act alters the traditional allocation of the burden of proof among the parties. To investigate whether a voting rights violation exists, it is necessary to review proffered evidence, and inferences therefrom, to determine whether boundary drawing practices may have abridged the rights of minority voters.

*Gingles* was an action brought by black voters of North Carolina challenging the use of one single-member district and six multimember districts in the state's legislative redistricting plan, claiming that such a plan impaired the ability of black citizens to elect representatives of their choice in violation of Section 2 of the Voting Rights Act. The *Gingles* court said that plaintiffs challenging multimember districting must establish that 1) the minority group is sufficiently large and geographically compact to constitute a majority in a single member district; 2) the minority group is politically cohesive; and 3) the white majority votes sufficiently as a block to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate. *Id.* at 50–51, 106 S.Ct. at 2766.

It is important to note that *Gingles* involved a challenge to *multimember* districts with a request for relief requiring the state to convert entirely to single-member districts. The *Gingles* court was careful to disclaim any intention to set standards for a dilution claim involving a single member districting scheme:

> We note also that *we have no occasion to consider whether the standards we apply to respondents' claims* that multi-

---

**28.** Section 2(b) of the Voting Rights Act states:
(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
42 U.S.C. § 1973(b) (1988).

member districts operate to dilute the vote of geographically cohesive minority groups that are large enough to constitute majorities in single-member districts and that are contained within the boundaries of the challenged multimember districts, *are fully pertinent to other sorts of vote dilution claims, such as a claim alleging that the splitting of a large and geographically cohesive minority between two or more* multimember or *single-member districts resulted in dilution of the minority vote.*

*Id.* at 47 n. 12, 106 S.Ct. at 2764 n. 12 (emphasis added). It is the latter type of claim plaintiffs make here, i.e., that the splitting of a large and geographically cohesive minority between two or more single-member senate districts in Minneapolis results in dilution of the minority vote. The disclaimer in *Gingles* says that the Supreme Court has not decided whether the preconditions apply to the sort of claim plaintiffs advance here.[29]

Perhaps more importantly, recent Supreme Court decisions reject the use of judicially created limitations to restrict coverage under Section 2. In *Chisom v. Roemer*, the court stated that

> [e]ven if serious problems lie ahead in applying the "totality of circumstances" described in § 2(b), that task, difficult as it may prove to be, cannot justify a judicially created limitation on the coverage of the broadly worded statute, as enacted and amended by Congress.

111 S.Ct. at 2368. The limits on the Voting Rights Act urged by the defendant intervenors, were we to apply them here, would be "judicially created limitation[s]" on the scope of Section 2 which are impermissible under *Chisom.*

Other courts also have held that the *Gingles* preconditions for challenging multimember districting do not apply to all Section 2 challenges. *See Armour v. State of Ohio*, 775 F.Supp. 1044, 1050–52 (N.D.Ohio 1991) (plaintiffs need not prove the first *Gingles* precondition that the minority is a large enough population to constitute a majority in a single-member district).

In light of the disclaimers in footnote 12 of *Gingles* and the Supreme Court's subsequent comments in *Chisom*, we do not view the three *Gingles* preconditions as dispositive in this case.[30]

*The Totality of the Circumstances*

Rather than mechanically apply the preconditions of *Gingles*, we look to the totality of the circumstances, as required by Section 2, and consider the factors listed in the Senate Judiciary Committee Report accompanying the bill that amended Section 2 in 1982. S.Rep. No. 417, 97th Cong., 2d Sess. 28–29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206–207. This report elaborates on the circumstances that may be probative of a Section 2 violation, noting the following "typical factors":

> 1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

---

**29.** It is arguably inappropriate to apply the *Gingles* preconditions to a claim that a boundary placement in single-member district scheme improperly dilutes the minority vote. A challenge to multimember districts seeking a forced conversion to single-member districting involves a structural change in the electoral system chosen by the state. The change needed to provide relief in this case is considerably less drastic. All agree here that single-member districting is appropriate. The question is only where particular boundaries should be drawn. *See also Armour v. State of Ohio*, 775 F.Supp. 1044, 1050–52 (N.D.Ohio 1991).

**30.** There is proof that the minority population has been fragmented and that it is sufficiently large and concentrated to form a majority in a single-member senate district. The record contains no statistical evidence, however, that the minority group is politically cohesive and that bloc voting operates to defeat minority preferred candidates. As commentators have noted, however, "many of the factors the Act deems important evidence of unequal access to the political process, ... such as racial block voting and the lingering effects of discrimination, are all but inevitable in the vast majority of cases." Howard & Howard, *The Dilemma of the Voting Rights Act—Recognizing the Emerging Political Equality Norm*, 83 Colum.L.Rev. 1615, 1625 (1983).

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Id.*

The record in this case is silent on many of the factors that a court may consider in evaluating a Section 2 claim. However, this silence cannot be considered as evidence rebutting the plaintiff's claim. The Senate Report makes this point clear: "The failure of plaintiff to establish any particular factor, is not rebuttal evidence of nondilution." S.Rep. No. 417 at 29 n. 118, 1982 U.S.C.C.A.N. at 207 n. 118.

The Senate Report states that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." S.Rep. No. 417 at 29, 1982 U.S.C.C.A.N. at 207. We are also mindful that redistricting is one of the major concerns of the Act. Even when changes are made for valid reasons, a jurisdiction may not always take appropriate care to avoid discriminating against minority voters in the process. S.Rep. No. 417 at 12 n. 31, 1982 U.S.C.C.A.N. at 189 n. 31.

In the present case, plaintiffs urge that certain historical facts, and the inferences to be drawn therefrom, establish a prima facie case of violations under the Voting Rights Act. As a result, this court makes the following findings of fact.

First, it is undisputed on the record that the Minnesota State Senate currently has no minority members from Minneapolis, nor has a minority member been elected to the state senate from Minneapolis in recent history. These are factors we may consider under the express language of Section 2: "The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered...." 42 U.S.C. § 1973(b) (1988). This is the only factor Congress chose to expressly mention in the statute. As noted in *LaComb v. Growe*, 541 F.Supp. 160, 164 (1982), Minnesota's only African–American legislator in 1982 was a house member from Minneapolis. We were advised by counsel at a hearing on October 11, 1991, that there is now only one minority house member from Minneapolis, although three other minorities have been elected to the legislature from other areas in Minnesota. The *Legislative Manuals* (1980–1990) published by the State confirm that only two minority members have been elected to the house from Minneapolis in the past decade, and both were elected from the same district (designated as House District 57B in the 1982 plan).

Second, the most concentrated senate district in Minneapolis under the districts established in 1982, Senate District 60, con-

tained 47.5% total minorities.[31] This concentration failed to elect a minority member to the senate in the last election. The senate districts established in 1982 do not contain super-majority minority concentrations, with the result that there are no minority senators. The results of elections under the 1982 districts, with no super-majority minority senate districts, are entitled to significant weight. Congress amended Section 2 of the Voting Rights Act in 1982 precisely "to make clear that certain practices and procedures that *result* in the denial or abridgement of the right to vote are forbidden even though the absence of proof of discriminatory intent protects them from constitutional challenge." *Chisom v. Roemer,* — U.S. —, 111 S.Ct. 2354, 2358, 115 L.Ed.2d 348 (1991).

Third, Minneapolis has a minority population of 87,316, or 23.7% of its total population. This population includes 47,948 African–Americans, 15,723 Asian–Americans, 12,335 Native Americans, 7,900 Hispanics, and 3,410 other minorities.[32] The legislative districts established in 1982 created six senate districts and twelve house districts entirely within the City of Minneapolis. *See LaComb v. Growe,* 541 F.Supp. 160, 162 (D.Minn.1982). If minorities had proportional representation in the Minneapolis legislative delegation, they would hold four seats in the eighteen Minneapolis legislative districts. Yet, minorities have held only one seat in these eighteen districts in the past decade. Although minorities are not guaranteed proportional representation under Section 2, we may consider the significant proportional underrepresentation of minorities in determining whether a violation of the Act has occurred. *See* S.Rep. No. 417, 1982 U.S.C.C.A.N. 177, *supra.*

Fourth, the only minority representative from Minneapolis now in the house was elected from a super-majority minority district. This is Representative Richard Jefferson of Minneapolis in House District 57B, which has a total minority concentration of 60% and an African–American concentration of 43%.[33] The Emison plaintiffs' have demonstrated that a senate district in Minneapolis can be drawn with minority populations which closely approximate those proven sufficient to elect minority members to the house of representatives. This proposed senate district would contain a 62.5% total minority concentration and a 44.5% African–American concentration.

Fifth, another factor we may consider under the Senate Report is the extent to which minorities bear the effects of discrimination in education, employment, or health. S.Rep. No. 417 at 29, 1982 U.S.C.C.A.N. at 206. The Minneapolis public school district has been found to have "acted intentionally to maintain or increase racial segregation in the schools." *Booker v. Special Sch. Dist. No. 1, Minneapolis,* 451 F.Supp. 659, 660 (D.Minn.1978). The district's policies were found to have been "especially offensive due to defendant's knowledge of the extensive nature of housing segregation within its bounds." *Booker v. Special Sch. Dist. No. 1, Minneapolis,* 351 F.Supp. 799, 809 (D.Minn. 1972).[34]

Sixth, we may also consider the extent to which the state has used voting practices or procedures that may enhance the opportunity for discrimination against the minority group. S.Rep. No. 417 at 29, 1982 U.S.C.C.A.N. at 206.[35] We find a strong

---

**31.** This information is from the Minority Population Report, dated August 20, 1991, provided to the Special Masters at the September 16, 1991 meeting with the parties' counsel.

**32.** Pub.L. No. 94–171, 89 Stat. 1023 (codified as amended at 13 U.S.C. § 141 (1988)).

**33.** *See* Minority Population Report, dated August 20, 1991, provided to the Special Masters at the September 16, 1991, meeting.

**34.** The continuing performance gap between minorities and whites in the Minneapolis school district was recently reported in the Minneapolis Star Tribune. *See* Bob Hotakainen, *Benchmark Test Passing Rates Fall, Hitting All-time Low,* Minneapolis Star Tribune, Feb. 5, 1992, at 1Bw.

**35.** The extent of any history of official discrimination in voting is another factor a court may consider under the Senate Report. S.Rep. No. 417 at 28, 1982 U.S.C.C.A.N. at 206. Although we do not rely on it, Minnesota has some history, albeit quite old, of official discrimination against minorities in the voting process. The

inference that the Minneapolis legislative districts in Chapter 246 were drawn to protect incumbents in the city's overwhelmingly white legislative delegation. Of the eighteen legislators from the City of Minneapolis, no incumbent senators are paired with other incumbents in the upcoming election, and incumbent house members are paired in only one house district. Some pairing would be literally inevitable in light of the relative population loss in Minneapolis.[36] It appears the avoidance of incumbent pairing took priority over the protection of minority interests in the plan proposed by the defendant intervenors.[37] "Since it is frequently impossible to preserve white incumbencies amid a high black-percentage population without gerrymandering to limit black representation, it seems to follow that many devices employed to preserve incumbencies are necessarily racially discriminatory." *Ketchum*

*v. Byrne*, 740 F.2d 1398, 1408 (7th Cir. 1984), *cert. denied*, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985).[38]

■ Although the record is not clearly developed on all factors, we conclude the evidence is sufficient to establish that minority voting interests have been diluted in the City of Minneapolis in violation of Section 2. This finding is consistent with the Supreme Court's admonition that the Act is to be interpreted in "the broadest possible scope," and that courts may not resort to "judicially created limitation[s] on the coverage of the broadly worded statute." *Chisom*, 111 S.Ct. at 2368. The all-white senate delegation from Minneapolis, the significant proportional underrepresentation of minorities from the overall legislative delegation from Minneapolis, the apparent attempt to protect incumbencies at the expense of minority concentrations, the

state constitution, as originally adopted in 1857, restricted the right to vote to "white citizens," "white persons," and only certain Native Americans. The voting restriction to "white" persons was eliminated in 1868, although state constitutional restrictions on the voting rights of Native Americans continued and were enforced until at least 1917. *See In re Liquor Election in Beltrami County (Opsahl v. Johnson)*, 138 Minn. 42, 163 N.W. 988 (1917).

**36.** Minneapolis declined in population from 370,951 in 1980 to 368,383 in 1990. The state's population as a whole, however, grew by approximately 7.3% during the same period. *Population Notes*, Minnesota State Demographer, April 1991. As a result, Minneapolis will lose one house district due to population shifts in the past decade.

**37.** Incumbent protection is not state policy in Minnesota. The issue of "incumbency" is a major political issue of the day, with strong advocates on each side. Incumbent protection was not, however, a redistricting standard chosen by the legislature in the concurrent resolutions unanimously adopted by both houses in its failed attempts at redistricting. (*See Emison*, No. 4–91–202 (D.Minn. Oct. 1, 1991) (Exhibits to the Memorandum of the Minnesota Legislature Regarding Criteria for Legislative and Congressional Redistricting Plans, filed October 1, 1991)). The concurrent resolutions did, however, provide that districts must not dilute minority voting strength, and that where a concentration of a racial or language minority makes it possible, the districts must increase the probability that minority members will be elected. Thus, the defendant intervenors' attempt to pro-

tect incumbents resulted in disregard of the announced state policy of non-dilution of minority populations.

**38.** We recognize that the disclaimer language in Section 2(b) provides "[t]hat nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." The legislative history is less than completely enlightening on the significance of this clause.

On the one hand, the Senate Report indicates the purpose of the clause was to "put[ ] to rest any concerns that have been voiced about racial quotas." S.Rep. No. 417 at p. 31, 1982 U.S.C.C.A.N. at 208. The report elsewhere makes clear "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." S.Rep. No. 417 at 29, 1982 U.S.C.C.A.N. at 207. Similarly, "[t]he failure ... to establish any particular factor is not rebuttal evidence of non-dilution." *Id.* at n. 118. Finally, the Senate Report notes that "the presence of minority elected officials is a recognized indicator of access to the [electoral] process." S.Rep. No. 417 at 16, 1982 U.S.C.C.A.N. at 193. On the other hand, the Senate Report also states that, "[t]he disclaimer thus guarantees that the question of whether minority candidates have been successful at the polls will not be dispositive in determining whether a violation has occurred." S.Rep. No. 417 at 68, 1982 U.S.C.C.A.N. at 247. The report also indicates that a mere history of minority underrepresentation, plus the addition of one other "factor" would not be sufficient to prove a violation. S.Rep. No. 417 at 34, 1982 U.S.C.C.A.N. at 212.

fragmentation of a geographically cohesive minority population into different senate districts, the educational disadvantage of Minneapolis minorities, the segregation in the Minneapolis school districts, and the judicial experience showing the need for super-majority minority districts, when considered all together, are sufficient to create a *prima facie* case in the totality of the circumstances which exists here.[39]

█ The plan submitted by the defendant intervenors which is essentially Senate File 1596, as vetoed by the Governor, fails to create any majority minority senate districts, but it does propose one near majority minority district. This district contains 49% total minorities, with African-Americans comprising only 29% of the district's population. The defendant intervenors' plan also creates a Minneapolis senate district with a total minority concentration of 40% and an African-American concentration of 28%.[40] Defendant intervenors' proposal as to these districts is also included in the plan adopted by the state district court in its December 9, 1991, order. *See* n. 23, *supra*. We find that the defendant intervenors' proposal, as adopted by the state court, fails to provide the equitable relief necessary to cure the violation of the Voting Rights Act.

To be sure, arguments can be made that creation of two strong minority-influenced senate districts in Minneapolis, one nearly a majority minority district, adequately protects minority voting interests. However, we cannot ignore the fact, which history has shown, that the all-white senate delegations from Minneapolis are the result of minority concentrations at the levels proposed by the defendant intervenors. And, where the defendant intervenors have not made a record to support its theory, we turn to judicial experience to find a reliable guide to action. *See Smith v. Clinton*, 687 F.Supp. 1361, 1363 (E.D.Ark.), *aff'd*, 488 U.S. 988, 109 S.Ct. 548, 102 L.Ed.2d 576 (1988). Judicial experience, as well as the results of past elections, suggests that the creation of a super-majority minority senate district in Minneapolis is necessary if we are to find that a districting scheme complies with the Voting Rights Act.

"[H]istorically disadvantaged minorities require more than a simple majority in a voting district in order to have ... a practical opportunity to elect candidates of their choice." *Whitfield v. Democratic Party*, 890 F.2d 1423, 1428 (8th Cir.1989) *aff'd en banc*, 902 F.2d 15 (8th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1089, 112 L.Ed.2d 1193 (1991) (quoting *Smith v. Clinton*, 687 F.Supp. 1361, 1362 (E.D.Ark.), *aff'd*, 488 U.S. 988, 109 S.Ct. 548, 102 L.Ed.2d 576 (1988)). The three-judge panel in *Smith,* noted that in fashioning a remedy for Voting Rights Act violations, a guideline of 65% of the total population is frequently used because, "[i]t is widely understood that 'minorities must have something more than a mere majority even of voting age population in order to have a reasonable opportunity to elect a representative of their choice.'" *Smith,* 687 F.Supp. at 1362–63 (quoting *Ketchum v. Byrne,* 740 F.2d at 1413).

Decisions from the most recent round of redistricting cases also suggest that "super-majority minority" districts are neces-

---

**39.** Although we do not find that a Voting Rights Act violation has been established in the area of the Red Lake and White Earth reservations, we note that Minnesota has some history of official discrimination in the voting process in the Red Lake reservation area. *See In re Liquor Election in Beltrami County (Opsahl v. Johnson),* 138 Minn. 42, 163 N.W. 988 (1917). We have been advised that State Senator Harold "Skip" Finn is a Native American. The state senate redistricting plan we adopt today contains a higher Native American concentration in that area than the plans proposed by the defendant intervenors or the plaintiffs.

**40.** The alternative approaches of the parties raise the sort of difficult questions Justice Marshall foresaw in *Beer v. United States,* 425 U.S. 130, 153–54 n. 12, 96 S.Ct. 1357, 1364 n. 12, 47 L.Ed.2d 629 (1976) (Marshall, J., dissenting). Here an increase in minority concentration to super-majority levels in one district results in a decline in minority voting strength in another district. For example, in the plans submitted by the parties, the second largest minority population senate districts in Minneapolis have a 19% minority variance, with the defendant intervenors creating a 40% minority district, and the Emison plaintiffs creating only a 21% minority district.

sary to adequately protect minority voting interests. Super-majority concentrations of "approximate[ly] 65% minority populations are generally regarded as necessary to ensure minorities a reasonable opportunity to control a district." *Hastert v. State Bd. of Elections,* 777 F.Supp. 634 (N.D.Ill. 1991). As the three-judge panel in *Hastert* explained:

> Minority concentrations of 65% total population and 60% voting age population within a single district are regarded as necessary to provide a minority population with a reasonable opportunity to "exercise political control over that district." *United Jewish Organizations, Inc. v. Carey,* 430 U.S. 144 [97 S.Ct. 996, 51 L.Ed.2d 229] (1977). These "super-majority districts" compensate for the higher non-voting age population percentages, lower voter registration and lower turnout found in minority communities. See *Ketchum v. Byrne,* 740 F.2d 1398, 1413–15 (7th Cir.1984), *cert. denied,* 471 U.S. 1135 [105 S.Ct. 2673, 86 L.Ed.2d 692] (1985); *In re Congressional Districts [Reapportionment] Cases,* No. 81 [sic] 81 C 3915, slip op. at 14 (N.D.Ill. Nov. 23, 1981).

*Id.* at 647 n. 20. We are also mindful of the admonition that "when reliable, determinative statistics are not available, in scrutinizing a redistricting plan for fairness to minority groups, the district court should give careful consideration to the 65% figure or some variation of it." *Ketchum v. Byrne,* 740 F.2d at 1416.

The plan we adopt today, attached as Section II.B., contains a super-majority minority senate district in Minneapolis Senate District 59, with a total minority concentration of 60% and an African–American concentration of 43%. This is the same minority concentration which has proven adequate to elect minority members to the house from Minneapolis. Although we do not achieve precisely the 65% guideline suggested by case law,[41] we use "some variation of it," *Ketchum,* 740 F.2d at 1416, to come as close as possible while respecting other announced criteria.[42]

*Federal Court Plan for Redistricting the State Legislature*

In view of our finding that the Voting Rights Act has been violated and plaintiffs are entitled to equitable relief, we turn to the overall question of legislative redistricting. The remedial plan we adopt today provides the relief necessary under the Voting Rights Act and the Constitution. In granting this equitable relief, we necessarily review the adjoining districts, and contemporaneously review and adopt a legislative redistricting plan to obviate the existing constitutional infirmities. Maps of the court legislative plan are attached in Section IV.A. The controlling descriptions for the House and Senate plans are attached in Sections II.A.3. and B.3. If there are any variances in other attachments, these census tract descriptions control. Also included in Sections II.A. and II.B. are computer generated data reflecting district populations, subdivision splits, minority populations, and incumbents. The results of a deviation analysis, a visual compactness analysis, and a computerized compactness analysis executed with the assistance of the system administrator of the Legislative Redistricting Committee are also attached as Section III.

---

**41.** We chose not to use the super-majority minority senate district proposed by the Emison plaintiffs, even though its minority concentration is slightly higher than the super-majority minority district created by the court. The Emison plaintiffs' district achieved a slightly higher minority concentration only by using boundary lines that were significantly jagged. The juts and teeth in that district are, in our view, excessive and not necessary to achieve an acceptable district.

**42.** Even if this court were to find the evidence insufficient to establish a voting rights violation, the affirmative relief we grant in the present case is no greater than that we would otherwise provide under the standards we imposed on any of the court plans to be submitted under paragraph 5 of this court's October 21, 1991, criteria order, which provides: "The districts shall preserve the voting strength of minority populations and will, wherever possible, increase the probability of such minority representation from areas of sizable concentrations of minority populations." *Emison,* No. 4–91–202 (D.Minn. Oct. 21, 1991) (Order at 3).

■ The constitutional requirements of redistricting plans are well established. In considering whether a plan of legislative redistricting is constitutional, a court must strive to achieve the lowest population deviations while also following expressions of state policy on compactness and contiguity. Of course, a court plan must be nonpartisan in achieving these standards.

The defendant intervenors urge that we adopt Chapter 246 as the basic configuration of any plan of redistricting. They argue that the Supreme Court's decision in *White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1972), and *Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982), require that we defer to Chapter 246 as expressing the "state policy." We cannot agree.[43]

Chapter 246 contained numerous infirmities, including excessive population disparities and noncontiguous districts. The parties concede Chapter 246 was a hastily drafted bill containing numerous errors. These constitutional defects were acknowledged by all of the parties. We agree that Chapter 246 is unconstitutional.

The defendant intervenors urge that we adopt the provisions of a bill, Senate File 1596, which allegedly contains the curative amendments to Chapter 246. This bill contains 160 changes to Chapter 246 spread over sixty-three pages of text. However, Senate File 1596 was vetoed by the Governor in January, 1992. Thus, the attempted correction of Chapter 246 has been rejected as state policy by the governor's veto. *See Duxbury v. Donovan,* 272 Minn. 424, 138 N.W.2d 692 (1965); *see also Smiley v. Holm,* 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932); *cf. Wise v. Lipscomb,* 437 U.S. 535, 539–40, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978). The executive has a constitutionally recognized role in redistricting in Minnesota. To urge that Chapter 246 as amended by Senate File 1596 reflects state policy ignores the veto of the highest executive officer of the state.

Further, Chapter 246, as well as the modifications proposed in Senate File 1596, do not provide a remedy for the diminution of minority voting rights we have addressed. Our discretion in fashioning relief is not limited to Chapter 246.

In preparing the court plan, we have considered state policy as expressed in various sources, including the state constitution and a bipartisan concurrent resolution unanimously adopted by both houses of the legislature.[44] The concurrent resolution reflects state policy on redistricting, and is substantially similar to the criteria this court previously adopted. This concurrent resolution provides, in relevant part:

(1) The Senate must be composed of 67 members. The House of Representatives must be composed of 134 members.

(2) Each district is entitled to elect a single member.

(3) A representative district may not be divided in the formation of a senate district.

(4) The districts must be substantially equal in population. The population of a district must not deviate from the ideal by more than two percent, plus or minus.

(5) The districts must be composed of convenient contiguous territory. To the extent consistent with the other standards in this resolution, districts should be compact. Contiguity by water is sufficient if the water is not a serious obstacle to travel within the district.

(6) The districts must be numbered in a regular series, beginning with House district 1A in the northwest corner of the state and proceeding across the state from west to east, north to south, but

---

**43.** The ease in which the court was able to correct the legislative plans in *Weiser* and *Upham* does not exist in the present case. *See* n. 50, *infra.* Among other things, no map of Chapter 246, as written, was provided to the court.

**44.** Defendant intervenors have acknowledged in briefs to this court that the concurrent resolutions of the legislature on redistricting are an expression of state policy. *Emison,* No. 4–91–

202 (D.Minn. Nov. 12, 1991) (Memorandum of the Minnesota Legislature in Response to the Emison Plaintiffs' Proposed Legislative and Congressional Redistricting Plans). The concurrent resolution was submitted to the Court on October 1, 1991, as an exhibit to defendant intervenors' brief on the criteria for legislative and congressional redistricting plans.

bypassing the seven-county metropolitan area until the southeast corner has been reached; then to the seven-county metropolitan area outside the cities of Minneapolis and St. Paul; then in Minneapolis and St. Paul.

(7) The districts must not dilute the voting strength of racial or language minority populations. Where a concentration of a racial or language minority makes it possible, the districts must increase the probability that members of the minority will be elected.

(8) A county, city, or town should not be divided into more than one district except as necessary to meet equal-population requirements or to form districts that are composed of convenient contiguous territory.

(9) The districts should attempt to preserve communities of interest where that can be done in compliance with the preceding standards.

Minn.H.R.Con.Res. No. 2, 77th Leg., Reg. Sess. (1991).

### A) *Population Disparities*

■■■ Equality of population in state legislative redistricting is a criteria which has thus far escaped the standards of exactness required in congressional redistricting at least where an otherwise lawful plan is validly enacted by the state legislature. *See, e.g., Connor v. Finch*, 431 U.S. 407, 418, 97 S.Ct. 1828, 1835, 52 L.Ed.2d 465 (1977); *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973).

Equality in population was recognized by the Minnesota legislature in its May, 1991, concurrent resolutions, which set a maximum permissible deviation of plus or minus 2%. This court's October 21, 1991, criteria order also set an outside deviation limit of plus or minus 2% in plans that would be considered by the court. Although the outer limit of plus or minus 2% deviation may be permitted by the federal constitution, this does not mean that where the legislature has failed to enact a valid plan, courts should not strive to implement, along with

other constitutional concerns, a plan of redistricting which provides the greatest numerical equality possible.[45] The plan this court now adopts has significantly lower population deviations from the ideal than the plans proposed by the defendant intervenors or the plaintiffs. In 1965, the Minnesota Supreme Court recognized that "[t]he whole object of [redistricting] ... 'is to vest in the people rights that inherently belong to them, namely, *participation upon an equal footing in the affairs of the state.*' " *Duxbury v. Donovan*, 272 Minn. 424, 434, 138 N.W.2d 692, 698–99 (1965) (quoting *State ex rel. Meighen v. Weatherill*, 125 Minn. 336, 341, 147 N.W. 105, 107 (1914)). The state constitution also provides that "[t]he representation in both houses shall be apportioned equally throughout the different sections of the state in proportion to the population thereof." Minn. Const. art. IV, § 2.

The Supreme Court has observed that any court-ordered reapportionment plan will be held to stricter standards and must strive to achieve "the goal of population equality with little more than *de minimis* variation." *Chapman v. Meier*, 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975). As the Court in *Chapman* stated, "[a] court-ordered plan, however, must be held to higher standards than a State's own plan. With a court plan, any deviation from approximate population equality must be supported by enunciation of historically significant state policy or unique features." *Id.* at 26, 95 S.Ct. at 765–66.

The defendant intervenors' proposed house districts range from a negative deviation of −1.96% (640 persons) to a positive deviation of 1.97% (643 persons), a range of 1243 persons or 3.93%. On average, i.e., the statistical mean deviation, these house districts deviate from the ideal population by .92% (302 persons). None of the house districts are at the ideal population level.

Plaintiffs' house districts range from a negative deviation of −.95% (309 persons)

---

**45.** Court-made plans must be viewed with greater scrutiny than legislative plans. *See Wise v. Lipscomb*, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497,

57 L.Ed.2d 411 (1978); *Connor v. Finch*, 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977).

to a positive deviation of .96% (314 persons), a range of 623 persons or 1.91%. On average, plaintiffs' house districts deviate from the ideal population by .32% (106 persons). One of the plaintiffs' house districts is at the ideal population level.

The house districts created by this court's plan range from a negative deviation of −.74% (243 persons) to a positive deviation of .66% (214 persons), a range of 457 persons or 1.40%. On average, the house districts deviate from the ideal population by .19% (62 persons). Six of the house districts in the plan adopted today are at the ideal population level.

The defendant intervenors' proposed senate districts range from a negative deviation of −1.83% (1197 persons) to a positive deviation of 1.59% (1036 persons), a range of 2233 persons or 3.42%. On average, the senate districts deviate from the ideal population by .66% (430 persons). None of the senate districts are at the ideal population level.

Plaintiffs did not submit statistical data for their senate districts. One can be deduced, however, from the house district data supplied by the plaintiffs. Plaintiffs' senate districts range from a negative deviation of −.80% (508 persons) to a positive deviation of .80% (508 persons), a range of 1016 persons or 1.60%. On average, the senate districts deviate from the ideal population by .24% (152 persons). One of the senate districts is at the ideal population level.

The senate districts created by this court's plan have population deviations ranging from a negative .74% (401 persons) to a positive deviation of .58% (368 persons), a range of 769 persons or 1.20%. On average, the senate districts deviate from the ideal population by .15% (95 persons). Two of the senate districts are at the ideal population level.

The defendant intervenors' plan fails to give each citizen of Minnesota an equally effective voice in the election of members to the legislature. For example, in one district 32,011 people have one representa-

tive under defendant intervenors' plan. In another district, 33,293 people are also entitled to one representative. Under the court's plan, 67% of the house district populations are within .25% of ideal. The defendant intervenors' plan only has 15% of the districts within .25%. We do not perceive any justification for the population disparities in their plan. The court's plan is more compact, splits fewer cities and townships, better protects minority voting rights, and still contains substantially lower population deviations.

B) *Municipal Boundaries*

This court's plan of legislative redistricting better meets the state policy of respecting municipal boundaries wherever possible. This element of state policy seeks to ensure that the equality of representation is also effective representation by attempting to follow and respect the communities of interest created by cities and other minor civil divisions. There are fewer city and township splits in our plan than in the plans proposed by the defendant intervenors or the plaintiffs. This court's senate plan splits only 36 cities and townships, while the defendant intervenors' plan splits 44 cities and townships. This court's house plan splits only 58 cities and townships. The house plan proposed by the defendant intervenors splits 61 cities and townships, while the plaintiffs' plan splits 92 cities and townships.[46]

C) *Compactness*

The court's plan is also more compact than either of the two plans submitted to the court. In evaluating the compactness of plans, we have used the methodology suggested in Polsby and Popper, *The Third Criterion: Compactness as a Procedural Safeguard Against Gerrymandering*, 9 Yale Law & Policy Review 301 (1991). The analysis was performed using the computer supplied by the parties and a computer program developed by the Redistricting System Administrator for the Legislative Subcommittee on Redistricting.

---

**46.** The Emison plaintiffs did not provide subdivision split data for their senate districts.

At the house district level, the court's redistricting plan is 7% more compact than that proposed by defendant intervenors and 6% more compact than plaintiffs' proposal. At the senate district level, the court's plan is 10% more compact than the plaintiffs' plan, and is as compact as the defendant intervenors' plan.[47] Overall, the court plan is more compact than either of the plans submitted.

### D) *Partisan Fairness*

The interests of both major political parties in Minnesota are represented in this case. Both have argued that the plans of redistricting submitted by the other are politically motivated and unfair.

In *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), the Supreme Court ruled that partisan gerrymandering was a justiciable issue. The much divided *Bandemer* Court established the following elements of this justiciable claim: "[I]n order to succeed ... plaintiffs were required to prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." *Id.* at 127, 106 S.Ct. at 2808. Further, the plurality disagreed with the position that "disproportionate election results alone are sufficient effect to support a finding of a constitutional violation." *Id.* at 142, 106 S.Ct. at 2815. Rather, the plurality found that it was "appropriate to require allegations and proof that the challenged legislative plan has had or will have effects that are sufficiently serious to require intervention by the federal courts in state reapportionment decisions." *Id.* at 134, 106 S.Ct. at 2811. Specifically, "[u]nconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole." *Id.* at 132, 106 S.Ct. at 2810.

Other than our concern expressed above relating to the dilution of minority voting interests, there has been no showing by any of the parties that either of the legislative redistricting plans submitted to this court for review are unconstitutionally gerrymandered under this test.[48]

In testing the political fairness of plans of redistricting, the parties urge that one indicia of unfairness is the extent to which the incumbents of one party or the other have been matched or paired with other incumbents in the new districts. Here, both parties urge that plans submitted to this court show clear indications of partisanship. These arguments must be evaluated with the Supreme Court's observation that minimizing the "number of contests between present incumbents does not in itself establish invidiousness." *White v. Weiser*, 412 U.S. 783, 797, 93 S.Ct. 2348, 2355–56, 37 L.Ed.2d 335 (1973) (quoting *Burns v. Richardson*, 384 U.S. 73, 89 n. 16, 86 S.Ct. 1286, 1295 n. 16, 16 L.Ed.2d 376 (1966)).

The plan developed by the court was developed without regard to the residence

---

**47.** A summary of the statistical compactness analysis is attached as Section III.3. Prior to the availability of the computer generated compactness analysis, the Special Masters utilized the alternative methodological technique of visually comparing the area of a district as a percentage of the area of a circumscribed circle around the district. The results of that analysis, although admittedly less precise than a computerized analysis, confirm the overall superior compactness of the court plan. A summary of that analysis is contained in Section III.2.

**48.** It should be noted that one of the principal architects of Chapter 246 has stated:

You can gerrymander!

Modern technology, while making it practicable to draw districts that are mathematically equal, has also allowed the majority to draw districts that pack and fracture the minority in a way as to minimize a possibility of there ever becoming a majority.

*The Courts are now faced with the need to develop new criteria for judging the 'fairness' of redistricting plans, but so far they have not succeeded.*

Peter S. Wattson, Senate Counsel for the State of Minnesota, *How to Draw Redistricting Plans That Will Stand Up in Court* (August 1, 1989) (emphasis added).

Given the adoption of the court's own plan, we need not today address how to develop such new criteria for judging constitutional fairness, but we do believe that such new criteria are needed.

of incumbents.[49] Adherence to principles of compactness and population equality, and respect for governmental boundaries insures that partisan gerrymandering is reduced or eliminated. *See*, Polsby & Popper, *The Third Criterion: Compactness as a Procedural Safeguard Against Partisan Gerrymandering*, 9 Yale L. & Pol'y Rev. 301 (1991); Backstrom, Robins & Eller, *Partisan Gerrymandering in the Post–Bandemer Era*, 4 Constitutional Commentary 285 (1987); Schwartzberg, *Reapportionment, Gerrymanders and the Notion of Compactness*, 50 Minn.L.Rev. 443 (1966).

The court's plan of redistricting was developed without regard to partisanship. Adoption of the court's plan insures that partisan motivation, if in fact it existed in the plans presented to us, is not perpetuated.

Finally, we consider *Weiser* and *Upham*. In those cases, congressional redistricting plans were the only evidence of state policy and the district courts did not rely on other state policies.[50] State policy in the present case is reflected in the bipartisan resolutions of the legislature. We also have followed state policy as reflected in the state constitution's requirement that population be apportioned equally. *See* Minn. Const. art. IV, § 2. We have also explained why we believe the plan complies with federal law, as well as the existing policy of the state.[51] In drafting a constitutional plan, *Weiser* and *Upham* do not limit our discretion by requiring adherence to an unconstitutional redistricting statute where the only proposed curative amendments have been rejected by the executive branch.

We are convinced that the court's plan constitutionally protects minority voting rights and best serves the interests of the citizens of the State of Minnesota by respecting city and township lines while creating more compact and more equally populated legislative districts.

*Congressional Plan*

The Minnesota legislature passed a congressional redistricting plan, Senate File 1597, on January 9, 1992, which was vetoed by the Governor that same day. As this attempt at redistricting failed to survive the legislative process, the proposed plan does not represent state policy. *See Dux-*

---

**49.** After it was completed, however, two boundaries were moved very slightly in an effort to strengthen minority representation. We took similar care to avoid pairing minority incumbents in drafting the 1982 legislative districts. See *LaComb v. Growe*, 541 F.Supp. 160, 164, 165 n. 14 (D.Minn.1982).

**50.** *Weiser* did not involve a Voting Right Act issue. In *Emison*, two parties have come forward claiming that their rights have been violated under this act. The issues in both *Weiser* and *Upham* involved relatively minor deviations from the optimal reapportionment plan which could be easily remedied without affecting other district lines. Such is not the case with *Emison*.

The average population deviations contested in *Weiser* were well under 2%. In *Emison*, this court is facing population deviations in Chapter 246 as great as 43.45% above the ideal and 45.10% below the ideal, with the total range of these deviations resting at 88.55%—this is 22.11 times the overall range which the Minnesota Legislature has imposed upon itself.

The holding in *Upham* addresses a court-ordered reapportionment plan for only *one* county. In *Emison*, this court is being asked to adopt approximately 160 corrections to Chapter 246 which allegedly affect over thirty state senate and house districts in approximately one third of the state's eighty-seven counties.

As the Court stated in *Weiser,* district courts "should defer to state policy in fashioning relief only where that policy is consistent with constitutional norms and not in itself vulnerable to legal challenge. The District Court should not, in the name of state policy, refrain from providing remedies fully adequate to redress constitutional violations which have been adjudicated and must be rectified." *Weiser,* 412 U.S. at 797, 93 S.Ct. at 2355.

**51.** As stated by Justice Stevens in *Karcher v. Daggett,* 466 U.S. 910, 911, 104 S.Ct. 1691, 1692, 80 L.Ed.2d 165 (1984) (Stevens, J., concurring):

Once a Constitutional violation has been found, a District Court has broad discretion to fashion an appropriate remedy.... Because the Forsythe Plan contained lower population variances, it more completely redressed the Constitutional violation. Nor was it an abuse of discretion to consider the fact that the Forsythe Plan created more compact districts; our previous opinion acknowledged that this was a legitimate consideration in reapportionment ...; here the District Court found that the plan advocated by appellants constituted 'an intentional gerrymander in favor of certain democratic representatives'.

*bury v. Donovan,* 272 Minn. 424, 432–33, 138 N.W.2d 692, 698 (1965). In the meantime, the congressional districts now in place remain seriously malapportioned. The existing districts deviate from the ideal as follows: [52]

| District | Total Pop. | Abs Dev. | % Dev. |
|---|---|---|---|
| 01 | 527,423 | −19,464 | − 3.56 |
| 02 | 480,079 | −66,808 | −12.22 |
| 03 | 668,263 | 121,376 | 22.19 |
| 04 | 539,004 | − 7,883 | − 1.44 |
| 05 | 498,387 | −48,500 | − 8.87 |
| 06 | 652,982 | 106,095 | 19.40 |
| 07 | 518,213 | −28,674 | − 5.24 |
| 08 | 490,748 | −56,139 | −10.27 |
| | | | |
| Plan Total | 4,375,099 | | |

| | | | |
|---|---|---|---|
| Largest Positive Deviation is: | 121,376 | 22.19 | Percent |
| Largest Negative Deviation is: | −66,808 | −12.22 | Percent |
| | | | |
| Overall Range: | 188,184 | 34.41 | Percent |

The "equal representation" standard of Article 1, § 2 of the Constitution requires that congressional districts "be apportioned to achieve population equality 'as nearly as is practicable.'" *Karcher v. Daggett,* 462 U.S. 725, 730, 103 S.Ct. 2653, 2658, 77 L.Ed.2d 133 (1983) (quoting *Wesberry v. Sanders,* 376 U.S. 1, 7–8, 84 S.Ct. 526, 530, 11 L.Ed.2d 481 (1964). *Karcher* goes on to state:

> Adopting any standard other than population equality, using the best census data available would subtly erode the Constitution's ideal of equal representation. If state legislators knew that a certain *de minimis* level of population differences was acceptable, they would doubtless strive to achieve that level rather than equality. Furthermore, choosing a different standard would import a high degree of arbitrariness into the process of reviewing apportionment plans.

*Karcher,* 462 U.S. at 731–732, 103 S.Ct. at 2659 (citing *Kirkpatrick v. Preisler,* 394 U.S. 526, 531–32, 89 S.Ct. 1225, 1229, 22 L.Ed.2d 519 (1969) (footnote omitted); *see*

*also White v. Weiser,* 412 U.S. 783, 790 at n. 8, 93 S.Ct. 2348, 2352 n. 8, 37 L.Ed.2d 335 (1973); *Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 1389, 12 L.Ed.2d 506 (1964).

We now adopt the congressional redistricting plan prepared by the Special Masters at the request of this court, which contains the smallest population deviations achievable. Five of the eight congressional districts are at the absolute ideal size for congressional districts in Minnesota, 546,887 people, and three of the districts deviate from the ideal by only one person. The plan preserves the basic "four-four" structure, adopted in 1982 in *LaComb v. Growe,* 541 F.Supp. 145 (1982), by creating four entirely metropolitan districts and four districts predominantly located in Greater Minnesota. It was not possible to honor the seven-county metropolitan area boundary lines completely because the state's population, while approximately half metropolitan and half outstate, is not exactly so divided.

Our congressional plan also respects county lines in Greater Minnesota, where

**52.** These congressional district population figures originate from the 1990 Census of Population and Housing data prepared by the United States Bureau of the Census. *See* n. 4, *supra.*

the county typically serves as an important unit of local government. Again, however, to achieve the ideal population equality agreed to by all parties, some county splits were unavoidable. In the metropolitan area, where municipalities are generally the more important units of government, some splits were unavoidable if population equality was to be achieved.

The congressional redistricting plan we adopt today is faithful to the principle of affording equal representation to all regions of the state, it minimizes population deviations from equality, and it is compact. Maps of the court's congressional plan are attached in Section IV.B. The controlling descriptions are attached in Section II.C.1. If there are any variances in other attachments, these census tract descriptions control. Also included in Section II.C. are computer generated data reflecting district populations, subdivision splits, and minority populations.

This court considered the three alternate plans submitted by the Emison plaintiffs, the Benson plaintiffs, and the defendant intervenors. After carefully weighing the many arguments advanced and alternatives proposed by all parties, however, we conclude that the plan we adopt today better meets state policy and our previously announced criteria.

## CONCLUSION

We find that the redistricting plan as submitted by the defendant intervenors and as adopted by the state district court, which fragments minority voting interests, fails to provide the affirmative relief necessary to adequately protect minority voting rights under Section 2 of the federal Voting Rights Act. 42 U.S.C. § 1973 (1988). The plan we adopt today contains a supermajority minority senate district in the City of Minneapolis with a total minority concentration of 60% and an African American concentration of 43%. In addition, the court finds that the plans submitted by the parties do not contain de minimis population deviations nor do they present compact or contiguous configurations. The court's plan of legislative redistricting better

meets the state policy respecting municipal boundaries wherever possible. The court further rejects the proposed congressional redistricting plans of the parties and adopts a plan which contains the minimal population deviations achievable and respects county lines in Greater Minnesota where the county typically serves as an important unit of government.

The foregoing opinion is hereby adopted as our findings of fact and conclusions of law.

This court was properly convened pursuant to 28 U.S.C. § 2284(a) and 28 U.S.C. §§ 1343(a)(3), (4). We acknowledge the stipulation by the parties as to the unconstitutional status of the 1982 congressional district plan and the 1983 state legislative district statutes. In the absence of timely remedial action by the state agencies, and in view of the proven need to prevent continuing dilution of minority voting rights, we conclude that it is our duty to effect a redistricting plan to replace what has been found to be invalid. Once adopted, such plans must govern the nomination and election of all state legislators for Minnesota and all United States Representatives from Minnesota beginning with the 1992 primary and general elections, continuing thereafter until the Minnesota state legislative process timely adopts its own constitutional redistricting plans. We further conclude that irreparable injury would occur in Minnesota to the people, electorate, candidates and their supporters if we did not permanently enjoin the subject of this order and insure that it is properly carried out.

We express our appreciation and gratitude to the parties and intervenors, to the office of the Attorney General of the State of Minnesota, to Special Masters John S. Hoyt, Jr., Joseph T. Dixon, and Gregory L. Wilmes, and to law clerks Elliott G. Smith and Susan J. Nolting, who have all cooperated in working diligently in reviewing the legislative and congressional redistricting plans.

IT IS THEREFORE ORDERED:

That defendant Joan Growe, the duly elected and qualified Secretary of State of

the State of Minnesota, in her official capacity, pursuant to Minnesota Statutes, Chapters 200–211B (Supp.1991), as the chief election officer of the State of Minnesota, and all those acting by and under her authority, accept filings and conduct elections only in accordance with the provisions of this order, and in conformity with the election statutes of the State of Minnesota which are not inconsistent therewith. Defendant Growe and those acting by and under her authority are enjoined from accepting filings otherwise than in conformity with this order, or from declaring the results of any such election held otherwise than in conformity with the order of this court, except as may be provided by law for the appeal of this order to the Supreme Court of the United States.

Jurisdiction is retained for the purpose of making any further orders deemed necessary to insure the effectuation of our order adopting a state legislative redistricting plan and a congressional redistricting plan for the State of Minnesota, and this order permanently enjoining interference with said redistricting plans.

Appropriate orders taxing costs against Joan Growe, Secretary of State of the State of Minnesota, will be entered for Masters' fees and expenses, assistants' fees and expenses, printing expenses, computer expenses, and miscellaneous supplies and equipment.

LET JUDGMENT BE ENTERED ACCORDINGLY.

MacLAUGHLIN, District Judge, concurring as to those parts of this decision relating to congressional reapportionment, and dissenting as to the parts of this decision relating to legislative reapportionment.

Since I believe neither the law nor the facts justify the majority opinion regarding legislative reapportionment, I dissent. On December 5, 1991, a majority of this Court enjoined the Minnesota state district court from any further proceedings in *Cotlow v. Growe*, No. C8–91–985 (Minn.Sp.Redistricting Panel), a case pending before the state court on the issue of legislative and congressional redistricting. That injunction was summarily and unanimously vacated by the Supreme Court of the United States on January 10, 1992. I dissented from the issuance of the injunction and stated, in part, as follows:

I do not agree that the state court should be enjoined from proceeding with its plan of reapportionment. I see no reason why that court is not fully able to consider and decide the reapportionment issues presented to it.

In addition, [the order of the state court] seems completely appropriate both as to the law and as to the reapportionment plan it proposes. Clearly Chapter 246 represents state policy which, in my judgment, must be the cornerstone of any new reapportionment plan. The amendments made to Chapter 246 by the state court ... are an attempt by the state court to follow the state policy provided in Chapter 246.

(Footnotes omitted.)

The majority now makes a last-minute attempt to thwart legitimate state policy and to prevent the state court plan from being implemented. I continue to strongly believe that the unvetoed law enacted by the Minnesota Legislature, that is, Chapter 246, must be the starting point for any reapportionment plan, and that the majority opinion clearly ignores the law in its failure to recognize that state policy.

The role of courts in reapportionment cases is narrowly circumscribed. The United States Supreme Court has made clear that reapportionment is primarily an issue for the political branches, and that "[i]n fashioning a reapportionment plan or in choosing among plans, a district court should not pre-empt the legislative task nor 'intrude upon state policy any more than necessary.'" *Upham v. Seamon*, 456 U.S. 37, 41–42, 102 S.Ct. 1518, 1521, 71 L.Ed.2d 725 (1983) (citing *White v. Weiser*, 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973)). A court-ordered reapportionment plan must reconcile the requirements of the federal constitution with the goals of state policy; "[a]n appropriate reconciliation ... can only be reached if the district

court's modifications of a state plan are limited to those necessary to cure any constitutional or statutory defect." *Id.* 456 U.S. at 43, 102 S.Ct. at 1522. The Supreme Court has therefore held that a district court impermissibly intrudes on state policy when, in choosing between two possible court-ordered redistricting plans, it fails to choose the plan that most closely approximates the state-proposed plan. *Id.* at 42, 102 S.Ct. at 1521 (citing *Weiser, supra*).

In the instant case, this Court has before it a lawfully enacted reapportionment plan, a plan that embodies the state policy of Minnesota regarding the apportionment of Minnesota's own legislative districts. Faced with choosing between a plan based on Minnesota's reapportionment legislation and plans unrelated to that legislation, this Court's obligation is clear: it errs if it does not choose the plan that is modeled on, and most closely approximates, the state policy as evidenced by the legislation. *See id.* The plan of the Minnesota state district court is based upon Chapter 246.[1] Chapter 246 is not perfect, but neither is it fatally flawed. Indeed, the Minnesota court properly found that constitutional defects in Chapter 246 could be cured and, in accordance with the mandate of the United States Supreme Court, made the adjustments nec-

essary to render the plan constitutionally sound.[2] *Cotlow v. Growe,* No. C8–91–985 (Minn.Sp.Redistricting Panel, Dec. 9, 1991). Under these circumstances, in my opinion, the proper role of this Court is to either stay its hand and allow the state court plan to proceed or to defer to Minnesota's legislative reapportionment policy by adopting the state court plan as our own.

## I. *The Alleged Voting Rights Violations*

The majority, in an extraordinary act of reaching out, concludes that voting rights violations exist and that it is therefore justified in brushing aside state policy in favor of its own reapportionment preferences.[3] This Court is of course obligated to ensure that any plan it adopts safeguards voting rights; as the United States Supreme Court has noted, the sole limitations on judicial deference to state apportionment policy are the substantive constitutional and statutory standards to which reapportionment plans are subject. *Upham,* 456 U.S. at 42, 102 S.Ct. at 1521. For several reasons, however, I cannot agree that voting rights violations have been proven in this case.

First and foremost, as far as voting rights are concerned,[4] the plaintiffs' allega-

1. The majority asserts that in devising its plan, the state court simply adopted the curative amendments passed by the legislature, but vetoed by the governor. However, in its order adopting its legislative redistricting plan, the state court specifically stated that because the curative amendments had not been adopted into law, they were not entitled to the deference to which Chapter 246 was entitled. *Cotlow v. Growe,* No. C8–91–985 at 11 (Minn.Sp. Redistricting Panel, Dec. 9, 1991).

2. In taking as its starting point the legislature's plan and making only those changes necessary to correct its defects, the state court followed the path of numerous federal courts that have deferred to state reapportionment policy by making only those changes that are statutorily or constitutionally required. *See, e.g., Cook v. Luckett,* 735 F.2d 912, 918 (5th Cir.1984); *Buskey v. Oliver,* 574 F.Supp. 41, 43 (M.D.Ala.1983); *Farnum v. Burns,* 561 F.Supp. 83, 92 (D.R.I. 1983); *Rybicki v. State Bd. of Elections,* 574 F.Supp. 1082, 1125 n. 108 (N.D.Ill.1982); *Terrazas v. Clements,* 537 F.Supp. 514, 528 (N.D.Tex. 1982).

3. I find it disturbing that the majority reaches its conclusions on voting rights issues without having had the benefit of briefs or oral arguments on the voting rights violations that it purports to find.

4. Plaintiffs have raised challenges based on the United States and Minnesota constitutions, as well as challenges based on the Voting Rights Act. In their papers and arguments, plaintiffs did not emphasize their voting rights claims; instead, they focused almost exclusively on their other claims.

   Moreover, the majority's assertion that the Emison plaintiffs urged the creation of a super-majority minority senate district in Minneapolis is not strictly accurate. The Emison plaintiffs argued instead that it was "possible" to create a senate district in Minneapolis with a higher concentration of African–Americans than that present in the legislative plan. Thus, they proposed the creation of a senate district with an African–American population of 44.5%; that is, they requested a senate district in which African–Americans constituted a plurality. Nowhere did they urge this Court to adopt a theory

tion is that because of population shifts, the apportionment plan established by court order in 1982 now dilutes minority voting rights in violation of section 2 of the Voting Rights Act, 42 U.S.C. § 1973. The 1982 court-ordered apportionment, however, was superseded when the legislature passed Chapter 246 and the state court declared Chapter 246 to be validly enacted law. When Chapter 246 became law, plaintiffs' allegations of voting rights violations in the 1982 apportionment were rendered irrelevant. Significantly, no party to this suit has alleged, much less proved, that Chapter 246 violates section 2 of the Voting Rights Act; rather, plaintiffs have asserted only that their proposed plan "better" preserves the political power of minorities. There is no requirement, however, that a lawfully enacted reapportionment plan that complies with the Voting Rights Act be set aside in favor of an allegedly "better" plan.[5]

Secondly, there is in my opinion simply no evidence in the record to support the majority's determination that an unlawful dilution of minority voting rights has been proven. As an initial matter, I am not persuaded by the majority's conclusion that this court is not bound to follow the three-part *Gingles* test in determining whether dilution has occurred. Reasoning that there are no salient differences between challenges to multi-member districting schemes and challenges to single-member districting schemes, numerous courts have concluded that the *Gingles* test applies to both types of voting rights challenges. *See, e.g., Jeffers v. Clinton,* 730 F.Supp. 196, 205 (E.D.Ark.1989), *aff'd,* —— U.S. ——, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991); *McDaniels v. Mehfoud,* 702 F.Supp. 588, 591 (E.D.Va.1988), *app. dismissed,* 927 F.2d 596 (4th Cir.1991); *Hastert v. State Board of Elections,* 777 F.Supp. 634, 655 (N.D.Ill.1991); *Neal v. Coleburn,* 689 F.Supp. 1426, 1435 (E.D.Va.1988); *Williams v. City of Dallas,* 734 F.Supp. 1317, 1413 (N.D.Texas 1990); *see also Romero v. City of Pomona,* 883 F.2d 1418, 1423 (9th Cir.1989) (concluding that the three-part *Gingles* test merely explains which of the indicia of dilution are most relevant in proving a section 2 violation). There has been, in this case, no effort to establish that the *Gingles* requirements can be met.

Even if the three-part *Gingles* test does not apply in this case, however, I cannot agree with the majority that the record establishes that voting rights violations exist. Before addressing the precise standard to be applied to section 2 challenges to multi-member districting plans, the *Gingles* Court reiterated the basic principles that must guide courts considering voting rights cases. The Court noted that although the legislative history accompanying section 2 sets forth a flexible, fact-intensive test for section 2 violations, it also places three limitations on the circumstances in which section 2 violations may be proved:

> First, electoral devices ... may not be considered *per se* violative of § 2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral

that super-majority minority senate districts were necessary in order for a redistricting plan to comply with the strictures of the Voting Rights Act. Pl.'s Mem. Regarding the Unfairness of the Legislature's Redistricting Plan at 13–14.

**5.** It is not at all clear that any of the plaintiffs' plans, or the plan that the majority now adopts, protects the rights of minority voters better than the legislature's own plan. The record reflects that the legislature took extraordinary steps to assure minority participation in the creation of its plan and to assure that minority interests were adequately protected in the plan it ultimately adopted. After conducting public hearings and seeking the input of leaders of such groups as the St. Paul Urban League, the Urban Coalition of Minneapolis, the Minnesota Indian Affairs Council, the Spanish Speaking Affairs Council, the Council on Black Minnesotans, the Minnesota Council on Asian–Pacific Affairs, and the National Association for the Advancement of Colored People, the legislature developed a plan that included one house district in which minorities constituted a super-majority, two house districts in which minorities constituted a bare majority, one house district in which minorities constituted a near majority, and one senate district in which minorities constituted a near majority. Mem. of the Minn. Legislature in Response to the Emison Pl.'s Proposed Redistricting Plans at 9–11.

process.... Second, the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation.... Third, the results test [set forth in § 2 and its legislative history] does not assume the existence of racial bloc voting; plaintiffs must prove it....
*Gingles*, 106 S.Ct. at 2764 (citations omitted). I believe that in concluding that voting rights violations have been established in this case, the majority disregards each of these three basic principles of voting rights jurisprudence.

The majority's holding is, in effect, a conclusion that a redistricting plan that does not contain a super-majority minority senate district in Minneapolis is an electoral device that is *per se* violative of section 2.[6] In an effort to establish that the totality of the circumstances show that a plan without a super-majority minority district results in unequal access to the electoral process, the majority searches far beyond the record, ultimately coming to rest upon four supposed indicia of unequal electoral access: a provision of the Minnesota Constitution (repealed more than a century ago) limiting voting rights to white persons, two school desegregation cases from the 1970s, a newspaper article reflecting performance gaps between minority and non-minority students in Minneapolis, and the fact that Chapter 246 pits no incumbent Minneapolis senators against each other. Problems such as school segregation and academic performance gaps, as well as past instances of discriminatory voting practices, are undeniably matters of concern for our society; from the record before this Court, however, I am unable to conclude that the problems reflect or result from minority vote dilution at the legislative level. The majority's reliance on these indicia to augment a silent record strains credulity.

Having concluded that a districting plan without a super-majority minority senate district in Minneapolis is a dilutive electoral mechanism, the majority violates the second basic principle of voting rights jurisprudence by concluding that the conjunction of that device and a lack of proportional representation in Minneapolis establishes a violation of section 2. The number of minority legislators from Minneapolis is not proportional to the percentage of minorities who live in Minneapolis. The only minority representative from Minneapolis currently serving in the Minnesota Legislature was elected from a super-majority minority district.[7] Therefore, the majority reasons, the lack of proportional representation flows from the absence of sufficient super-majority minority districts in Minneapolis. Section 2, however, specifically cautions against resting findings of voting rights violations on the lack of proportional representation. *See* 42 U.S.C. § 1973(b) ("nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population").

Finally, rather than requiring the plaintiffs in this case to prove the existence of racial bloc voting,[8] the majority assumes its existence. As the *Gingles* court recognized, "courts and commentators agree that racial bloc voting is a key element of a vote dilution claim." *Id.* 106 S.Ct. at 2769 (citations omitted). The existence of racial bloc voting is typically proven by statistics that correlate voting patterns with the race

---

6. There may well be merit in creating a district with a super-majority of minority voters as a remedy for a voting rights violation. Rather than turning to the technique as a remedial measure, however, the majority relies on the absence of such districts to establish a violation of the Voting Rights Act. Such a reliance is, I believe, erroneous in law as well as in fact.

7. It is worth noting that several legislative districts outside the City of Minneapolis have elected members of minority groups to the Minnesota Legislature, despite the fact that those districts do not contain a super-majority of minority voters. Those districts include Senate Dis-

trict 4, with a total minority population of 15%, House District 65B, with a total minority population of 24%, and House District 40A, with a total minority population of 7%. *See* Minority Population Report dated August 20, 1991, provided to the Special Masters at the September 16, 1991 meeting.

8. The legal concept of racial bloc voting, or racially polarized voting, refers to the existence of a correlation between the race of voters and the selection of candidates. *Gingles*, 106 S.Ct. at 2779.

of the voter and the candidate. As the majority acknowledges, no such statistics have been advanced in this case; the majority attempts to sidestep this lack of proof by relying on a law review article stating that "racial block voting [is] all but inevitable in the vast majority of cases." Maj. Op. at 436 n. 30 (citing Howard & Howard, *The Dilemma of the Voting Rights Act—Recognizing the Emerging Political Equality Norm*, 8 Colum.L.Rev. 1615, 1625 (1983)). The majority's assumption that racial bloc voting is "all but inevitable" in this case, however, is precisely the assumption that the Supreme Court and the legislative history accompanying section 2 forbid. The broad, generalized statements of commentators cannot substitute for evidence of racially polarized voting.

The majority's assumption of racially polarized voting appears again in its conclusion that super-majority minority districts are necessary for minorities to exercise their political rights in Minneapolis. The majority reasons that because the 1982 senate district containing the highest concentration of minorities failed to elect a minority representative in the last election, higher concentrations of minorities are a requisite part of a valid redistricting plan. Significantly absent from the record, however, are facts demonstrating that less than super-majority concentrations of minorities have resulted in limited access to the electoral process. In short, the record simply does not support a finding of voting rights violations.

## II. *The Necessity of Following State Policy*

However, it is immensely important to recognize that, even if the record did support a finding of voting rights violations, the majority's wholesale rejection of the state plan would be unwarranted. Correcting voting rights violations does not require this Court to jettison Minnesota's val-

idly enacted reapportionment plan; any voting rights defects may—indeed, under *Upham* and *Weiser* must—be remedied by modifying the state plan.

To justify abdicating its obligation to follow the state policy embodied in Chapter 246, the majority attempts to distinguish the facts of this case from those in *Weiser* and *Upham*. The majority asserts that this Court, unlike those in *Weiser* and *Upham*, has before it not only the state's redistricting plan, but the state policies reflected in Minnesota's constitutional requirement of equal apportionment and in the legislature's bipartisan resolution establishing the criteria for its redistricting plan. This, however, is a distinction without a difference, because in my opinion, Chapter 246 conflicts with neither of those statements of state policy. Moreover, if Chapter 246 did conflict with other state policies, *Upham* and *Weiser* would require this Court to reconcile the conflicts.

The majority also suggests that it need not follow the state policy expressed in Chapter 246 because it would be difficult to do so. In my opinion, the majority exaggerates the difficulties inherent in basing a court-ordered plan on Chapter 246; the state court, after all, found it possible to correct Chapter 246's constitutional defects.[9] The fact that the majority finds defects based on the Voting Rights Act, and not the U.S. Constitution, does not alter this Court's obligation to limit its remedial measures to correcting those defects; *Upham*, too, involved voting rights challenges. Moreover, the sole voting rights defect identified by the majority is the lack of a super-majority minority senate district in Minneapolis. Surely a defect in a single district does not require this Court to discard the legislative plan in its entirety.[10] Finally, I see nothing in *Weiser* or *Upham* limiting the obligation to follow state policy to instances in which it can be accomplished with ease.

9. The majority asserts that the parties' failure to provide this Court with a map of Chapter 246 made it impossible for the Court to rely on Chapter 246 in creating its plan. In its consideration of Chapter 246, the state court had before it maps depicting the redistricting plan embodied in Chapter 246. *Cotlow v. Growe*, No.

C8–91–985 at 10, 15 (Minn.Sp.Redistricting Panel, Dec. 9, 1991). If the parties neglected to provide this Court with these resources, it was an oversight that could surely have been easily corrected.

10. In *Upham*, the district court devised its own plan for four districts, rejecting the legislature's

In substituting its own plan for that of the state, the majority defies the Supreme Court's mandate that reapportionment remedies be limited by the scope and nature of the violation. *Upham*, 456 U.S. at 42, 102 S.Ct. at 1521 (citing *Whitcomb v. Chavis*, 403 U.S. 124, 161, 91 S.Ct. 1858, 1878, 29 L.Ed.2d 363 (1971)). More fundamentally, the majority defies the policy of judicial deference to legislative action that underlies the Supreme Court's mandate. This Court attempted, in its injunction, to prohibit the Minnesota court from finalizing its reapportionment plan. The United States Supreme Court rejected that approach. Having failed to successfully enjoin the state court's reapportionment plan, the majority, instead of staying its hand and allowing the state plan to proceed, reaches out in an invalid and transparent second attempt to accomplish the same purpose.

The people of Minnesota are the real losers in this unprecedented battle between two courts. Hopefully, the United States Supreme Court, upon appropriate application, will quickly move to resolve these issues.

I respectfully dissent.

---

plan for those districts; the Supreme Court held that even though the district court followed the legislature's plan in all other respects, it erred in adopting its own plan in the four districts. In the instant case, the majority's action far exceeds the action struck down in *Upham*, because here, the majority adopts its own plan not just for a few isolated districts, but for the entire state.